Argued and submitted September 10, 2001, judgment of circuit court affirmed in part and reversed in part; case remanded to circuit court for further proceedings October 4, 2002

## LEAGUE OF OREGON CITIES,
Benton County, City of Beaverton,
City of Eugene, Junction City,
City of Veneta, Bev Stein, Vera Katz,
Multnomah County, City of Portland,
and Washington County,
*Plaintiffs-Respondents,*

*v.*

## STATE OF OREGON,
John Kitzhaber, M.D.,
and Bill Bradbury,
*Defendants-Appellants,*

*and*

Stuart MILLER,
*Intervenor-Appellant.*

(CC 00C-20156; CA A113789; SC S48450 (Control))
(Consolidated for Briefing, Argument, and Decision)

Audrey McCALL,
Hector MacPherson, Michael E. Swaim,
James Lewis, and Mark Tipperman,
*Plaintiffs-Respondents,*

*v.*

John KITZHABER, M.D.,
Bill Bradbury,
and State of Oregon,
*Defendants-Appellants,*

*and*

Stuart MILLER,
*Intervenor-Appellant.*

(CC 00C-19871; CA A113790; SC S48451)

56 P3d 892

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for defendants-appellants. With her on the briefs were Stephanie Striffler, Special Counsel to the Attorney General, Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

John A. DiLorenzo, Jr., of Hagen Dye Hirschy & DiLorenzo, P.C., Portland, argued the cause for intervenor-appellant. With him on the briefs were Aaron K. Stuckey, and Justin J. Burns, Portland.

William F. Gary, of Harrang Long Gary Rudnick, P.C., Eugene, argued the cause for respondents League of Oregon Cities, Benton County, City of Beaverton, City of Eugene, Junction City, City of Veneta, Bev Stein, Vera Katz, Multnomah County, City of Portland, and Washington

County. With him on the briefs were Glenn Klein, James E. Mountain, Jr., Susan D. Marmaduke, and Janice L. Mackey. Also on the briefs were Jeffrey L. Rogers, City Attorney, and Madelyn Wessel and Linda Meng, Chief Deputy City Attorneys, Portland, and Thomas Sponsler, Multnomah County Attorney, and Sandra N. Duffy, Deputy County Attorney, Portland.

Thomas M. Christ, of Cosgrave, Vergeer & Kester, Portland, filed the brief and argued the cause for respondents Audrey McCall, Hector MacPherson, Michael E. Swaim, James Lewis, and Mark Tipperman.

James E. Leuenberger, Lake Oswego, filed the brief for *amici curiae* Don McIntire and Fred Hall.

John M. Groen, of Groen Stephens & Klinge, LLP, Bellevue, Washington, filed the brief for *amici curiae* Pacific Legal Foundation and Home Builders Association of Metropolitan Portland. With him on the brief were Robin L. Rivett and Benjamin C. Waggoner, of Pacific Legal Foundation, Bellevue, Washington.

Gregory W. Byrne, Portland, filed the brief for *amicus curiae* Oregon Taxpayers United.

Ross Day, Portland, filed the brief for *amici curiae* Frank Eisenzimmer, U.S. Term Limits, and Oregonians for Fair Term Limits.

David J. Hunnicutt, Tigard, filed the brief for *amicus curiae* Oregonians in Action-Legal Center.

Gerald P. Linder, Hillsboro, filed the brief for *amicus curiae* The Association of Clean Water Agencies. With him on the brief were Edward J. Sullivan and William K. Kabeiseman, Preston Gates & Ellis LLP, Portland, for *amici curiae* The American Planning Association and The Association of Clean Water Agencies.

Frederick A. Batson, of Gleaves Swearingen Larsen Potter Scott & Smith LLP, Eugene, filed the brief for *amici curiae* Betty Wiemers and Dorothy English.

CARSON, C. J.

Durham, J., concurred in part and dissented in part, and filed an opinion.

## CARSON, C. J.

In these two consolidated proceedings, plaintiffs seek to invalidate Ballot Measure 7 (2000), set out *post*, 334 Or at 665-67, an initiated amendment to the Oregon Constitution that the voters approved at the 2000 general election. The trial court agreed with plaintiffs that Measure 7 was adopted in violation of the "separate-vote" requirement of Article XVII, section 1, of the Oregon Constitution, also set out *post*. The trial court therefore declared Measure 7 to be invalid and entered judgment accordingly. The state[1] appealed to the Court of Appeals, that court certified the appeals to this court, and this court accepted certification. We now hold, as did the trial court, that Measure 7 was adopted in violation of the separate-vote requirement set out in Article XVII, section 1, and, therefore, is void in its entirety.

## I. FACTS AND PROCEDURAL BACKGROUND

On November 7, 2000, the voters appear to have approved Measure 7,[2] which, generally speaking, would have added to Article I, section 18, of the Oregon Constitution text requiring governments to compensate private real property owners for the cost of "restrict[ive]" regulations that reduce the value of their real property. On November 24, 2000, before the Secretary of State had completed canvassing the votes on Measure 7, *McCall* plaintiffs filed their complaint, alleging that the measure was invalid because it was adopted in violation of various provisions of the Oregon Constitution, including Article XVII, section 1, which sets out a separate-vote requirement for constitutional amendments.[3] In their

---

[1] Both actions name the State of Oregon, Governor Kitzhaber, and Secretary of State Bradbury as defendants. We refer to all three defendants collectively as "the state" throughout this opinion.

[2] As explained below, although the Secretary of State has not yet completed canvassing the votes on Measure 7, the official county election results contained in the record demonstrate that a majority of voters approved the measure.

[3] *McCall* plaintiffs also contended that Measure 7 was adopted in violation of Article IV, section 1(2)(d), which sets out a "full-text" requirement for initiative petitions and a "single-subject" requirement for laws and constitutional amendments proposed by initiative petition, and Article XVII, section 2, which sets out the process for adopting constitutional revisions. *McCall* plaintiffs later contended before the trial court that submission of Measure 7 also violated ORS 251.195, which sets out voters' pamphlet requirements for proposed constitutional

complaint, *McCall* plaintiffs sought a judicial declaration that Measure 7 was not validly adopted, and, three days after filing their complaint, they moved for a preliminary injunction preventing the Secretary of State from canvassing the votes on the measure and preventing the Governor from declaring whether the measure had passed. *League of Oregon Cities* (*League*) plaintiffs[4] filed their complaint on December 5, 2000, also before completion of canvassing, raising essentially the same constitutional challenges as *McCall* plaintiffs and also seeking a declaratory judgment; *League* plaintiffs simultaneously moved for a preliminary injunction. *McCall* plaintiffs, but not *League* plaintiffs, also specifically sought recovery of attorney fees. In its answer to both complaints, the state asserted that some or all plaintiffs lacked standing and that the trial court lacked subject matter jurisdiction over both actions.

In December 2000, the trial court consolidated the actions and issued a preliminary injunction, enjoining the Secretary of State from canvassing the votes on Measure 7 and the Governor from declaring or proclaiming the results of the election. In early January 2001, Miller (intervenor), originally the chief petitioner of the initiative petition that ultimately became Measure 7, moved to intervene in the consolidated actions, and the trial court granted that motion. In his answer, intervenor contended, among other things, that the actions were not ripe for adjudication and that all plaintiffs lacked standing.

Shortly thereafter, all plaintiffs filed motions for summary judgment, and the state and intervenor filed cross-motions for summary judgment. At the summary judgment hearing, intervenor submitted evidence that set out the official county election results and demonstrated that Measure 7 had received more than 53 percent of the vote.

---

amendments, thereby also violating Article IV, section 1(4)(b), which requires that initiatives be submitted according to laws not inconsistent with that section.

[4] The trial court concluded that all plaintiffs (in both actions) except plaintiff League of Oregon Cities had standing under ORS 28.020. *League* plaintiffs, collectively, do not challenge that conclusion on appeal; accordingly, future references to "*League* plaintiffs" in this opinion do not include plaintiff League of Oregon Cities.

In February 2001, the trial court granted plaintiffs' motions for summary judgment and denied the state's and intervenor's cross-motions. The court rejected the state's and intervenor's arguments respecting jurisdiction, standing (except, as noted, the argument concerning plaintiff League of Oregon Cities), and ripeness, and also rejected most of plaintiffs' constitutional arguments. However, the court agreed with plaintiffs that Measure 7 violated the separate-vote provision of Article XVII, section 1, of the Oregon Constitution and, accordingly, was invalid. The court later entered judgment in both actions, declaring that the measure should not have been submitted to the voters, had not become effective, and was not part of the Oregon Constitution.[5]

The state appealed, and the Court of Appeals certified the appeals to this court. This court accepted the certification and consolidated the proceedings for purposes of appeal.

## II. JURISDICTION

### A. *Jurisdiction under the Uniform Declaratory Judgments Act*

The state contended below that the trial court did not have subject matter jurisdiction because plaintiffs filed their challenges to Measure 7 after the election, but before the Secretary of State had completed the process of canvassing the votes and certifying the measure. The trial court disagreed and assumed jurisdiction under ORS 28.010 to 28.160, the Uniform Declaratory Judgments Act (UDJA). On appeal, the state and intervenor argue that the trial court erred in assuming jurisdiction under the UDJA because another statute, ORS 250.044(1), provided plaintiffs with the exclusive method of challenging a ballot measure after the election. The state, but not intervenor, alternatively argues

---

[5] The trial court also concluded that Measure 7 violated the full-text requirement of Article IV, section 1(2)(d); however, the court rejected plaintiffs' arguments respecting single-subject and revision, and did not rule on *McCall* plaintiffs' argument respecting submission according to election laws.

On appeal, neither set of plaintiffs challenges the trial court's conclusion respecting the single-subject requirement. All other matters pending before the trial court discussed above, with the exception of attorney fees, have been raised on appeal. Because we resolve this case based upon the separate-vote requirement, we do not address the remaining constitutional issues.

that, even if ORS 250.044(1) did not provide an exclusive method for plaintiffs' challenge, it at least provided a more appropriate method for the challenges at issue here. For the reasons set out below, we disagree with both contentions and hold that the trial court did not err in assuming jurisdiction under the UDJA.

ORS 28.010 provides, in part:

"Courts * * * within their respective jurisdictions shall have power to declare rights, status, and other legal relations, whether or not further relief is or could be claimed. * * *"

Although a trial court has broad power to provide declaratory relief, it lacks subject matter jurisdiction under ORS 28.010 if some other *exclusive* remedy exists. *Alto v. State Fire Marshal*, 319 Or 382, 395, 876 P2d 774 (1994). In addition, the trial court should decline to exercise its jurisdiction under ORS 28.010 if some *more appropriate* remedy exists. *Brooks v. Dierker*, 275 Or 619, 624, 552 P2d 553 (1976).

The state first argues that ORS 250.044(1)[6] is the type of exclusive remedy addressed in *Alto* that prevents a trial court from assuming jurisdiction under ORS 28.010. As this court explained in *Swett v. Bradbury*, 333 Or 597, 605, 43 P3d 1094 (2002), decided after oral argument in this case, ORS 250.044(1) is not "exclusive" in the manner that the state asserts. That statute does not concern *all* ballot measure challenges; rather, it concerns only those ballot measure challenges brought on constitutional grounds during the six-month period after the Secretary of State certifies that the electors have adopted the challenged measure. *Id.* As in

---

[6] ORS 250.044(1) provides, in part:

"An action that challenges the constitutionality of a measure initiated by the people * * * must be commenced in the Circuit Court for Marion County if:

"(a) The action is filed by a plaintiff asserting a claim for relief that challenges the constitutionality of * * * an amendment to the Oregon Constitution initiated by the people * * * under section 1 (1) to (4), Article IV of the Oregon Constitution;

"(b) The action is commenced on or after the date that the Secretary of State certifies that the challenged measure has been adopted by the electors and within 180 days after the effective date of the measure; and

"(c) The action may not be commenced in the Oregon Tax Court."

*Swett,* plaintiffs here did not file their challenges within that time period; consequently, ORS 250.044(1) does not apply to their actions.

The state's alternative argument—that ORS 250.044(1) nonetheless would have provided a more appropriate avenue for plaintiffs' challenges—incorrectly assumes that ORS 250.044(1) provides an independent basis for circuit court jurisdiction over a ballot measure challenge. In other words, the state argues that, if plaintiffs had waited until after certification, ORS 250.044(1) itself would have conferred jurisdiction upon the trial court over their ballot measure challenges and jurisdiction under ORS 28.010 therefore would have been unnecessary. However, that argument is contrary to the explicit text of ORS 250.044(2), which provides, in part:

> "An action under subsection (1) of this section *must be within the jurisdiction of circuit courts* and must present a justiciable controversy. * * *"

(Emphasis added.) By its terms, subsection (2) of ORS 250.044 indicates that subsection (1) itself does not confer jurisdiction over a ballot measure challenge. Instead, as this court explained in *Swett,* ORS 250.044(1) only sets out a list of three requirements "respecting when and where a certain class of ballot-measure challenges must be filed." 333 Or at 605. Therefore, even if plaintiffs had waited for the Secretary of State's certification of Measure 7 to bring their challenge, they nevertheless would have had to assert jurisdiction under the UDJA (or another appropriate statute, if any). For those reasons, we reject the state's argument that the trial court lacked subject matter jurisdiction under ORS 28.010.

## B. *Jurisdiction under ORS 246.910(1)*

Ordinarily, our discussion of jurisdiction would end at this point, that is, with our conclusion that the trial court properly assumed jurisdiction under a particular statutory scheme. However, because we conclude, as discussed below, that only two *McCall* plaintiffs have standing under the UDJA, we must consider the remaining *McCall* plaintiffs' alternative theory of jurisdiction under ORS 246.910(1), which concerns challenges to actions by the Secretary of

State.[7] That consideration is necessary, because, if the trial court had jurisdiction under ORS 246.910(1), then any *McCall* plaintiffs who do not have standing under the UDJA would have the opportunity to assert standing under ORS 246.910(1). *See Local No. 290 v. Dept. of Environ. Quality*, 323 Or 559, 565, 919 P2d 1168 (1996) (when ruling on standing, court must focus upon wording of particular statute at issue). Accordingly, we now address *McCall* plaintiffs' argument under ORS 246.910(1). For the reasons set out below, we conclude that the trial court did not have jurisdiction under that statute.

■ ORS 246.910(1) provides, in part:

"A person adversely affected by any act or failure to act by the Secretary of State * * * may appeal therefrom to the circuit court for the county in which the act or failure to act occurred * * *."

In their complaint, *McCall* plaintiffs specifically allege four acts by the Secretary of State (or his predecessor) that adversely affected them. Three were "decisions that resulted in Measure 7 appearing on the ballot[:] * * * accepting the proposed petition, verifying that the petition contained the requisite number of signatures, and certifying the measure for placement on the ballot."[8] The fourth, deciding to canvass and beginning to canvass the votes for and against Measure 7, occurred after the election and was in progress when plaintiffs filed their actions.[9]

---

[7] We also conclude below that two *League* plaintiffs, Katz and Stein, lack standing under ORS 28.020. However, *League* plaintiffs did not argue alternatively that the trial court had jurisdiction under ORS 246.910(1).

[8] We take judicial notice of the following facts: (1) Measure 7 began as Initiative Petition 46 (2000); (2) the petition originally was filed with the Secretary of State on March 10, 1999; (3) the Attorney General certified the ballot title on April 9, 1999; (4) the Secretary of State approved the proposed initiative for circulation on May 28, 1999; and (5) the Secretary of State certified the ballot measure (as Measure 7) on July 26, 2000. *See generally* OEC 201(f) (judicial notice may be taken "at any stage of the proceedings"); *Leo v. Keisling*, 327 Or 556, 559 n 1, 964 P2d 1023 (1998) (taking judicial notice of earlier elections activity surrounding ballot measure at issue).

[9] All *McCall* plaintiffs also alleged that they were registered voters. That allegation, together with those plaintiffs' opposition to Measure 7, was sufficient to establish that they were "person[s] adversely affected" by an action of the Secretary of State, as ORS 246.910(1) requires. *See Ellis v. Roberts*, 302 Or 6, 10-11, 725 P2d 886 (1986) ("adversely affected" requirement of ORS 246.910(1) means that

On appeal, the state does not address *McCall* plaintiffs' challenge as a challenge to several distinct acts by the Secretary of State as alleged in the complaint. Instead, the state characterizes *McCall* plaintiffs' challenge generally as a challenge to the Secretary of State's initial constitutional evaluation of the proposed initiative petition that ultimately became Measure 7. The state then argues that *that* challenge is untimely because it was not filed within 60 days of the Secretary of State's certification of the ballot title, as required by *Ellis v. Roberts*, 302 Or 6, 725 P2d 886 (1986).[10]

*McCall* plaintiffs agree that the Secretary of State's constitutional evaluation of the proposed initiative petition that became Measure 7 is the "act" at the heart of this challenge.[11] *McCall* plaintiffs do not contend that they were adversely affected by the Secretary of State's other acts set out above; they also do not allege that any of those acts were improper *per se*.[12] Rather, they contend that they were adversely affected by the acts identified in their complaint

---

any registered voter can file action challenging Secretary of State election ruling). We contrast that requirement with ORS 28.020, discussed below, which requires for purposes of the UDJA that a person's "rights, status, or other legal relations" be affected "by a constitution, statute, [or] municipal charter."

[10] Intervenor generally argues that no challenge upon these grounds may be brought under ORS 246.910(1) after the general election. Our discussion below, addressing the state's similar, but more specific, argument, disposes of intervenor's argument.

[11] At the summary judgment hearing, counsel for *McCall* plaintiffs told the trial court that the issue was "whether or not [Measure 7] was properly on the ballot."

This court has held that the Secretary of State has the duty to examine an initiative petition for compliance with the single-subject requirement of Article IV, section 1(2)(d), of the Oregon Constitution and to refuse to accept those that violate the rule. *OEA v. Roberts*, 301 Or 228, 235, 721 P2d 833 (1986). The parties assume that, in addition to that duty, the Secretary of State has the duty to examine an initiative petition for compliance with other form-of-adoption requirements of the Oregon Constitution, including the "full-text" requirement of Article IV, section 1(d), the "separate-vote" requirement of Article XVII, section 1, and the constitutional revision requirements of Article XVII, section 2. Because there is no dispute in this case about the extent of the Secretary of State's duty to review an initiative petition, we assume without deciding that that duty includes the duty to review such a measure for compliance with all other constitutional provisions at issue in this case.

[12] For example, *McCall* plaintiffs do not argue that the Secretary of State was canvassing the votes improperly.

only insofar as those acts were steps toward the implementation of a ballot measure that, according to *McCall* plaintiffs, violates multiple form-of-adoption requirements of the Oregon Constitution.

■ Despite their agreement that the Secretary of State's constitutional evaluation of the proposed initiative petition that became Measure 7 is the act truly at issue here, *McCall* plaintiffs nevertheless argue that *Ellis* does not apply to their challenge. They argue that the 60-day deadline set out in *Ellis* applies to only challenges under ORS 246.910(1) that seek to keep a measure off the ballot, that is, to challenges brought before the election. Because they brought their challenge after the election, *McCall* plaintiffs argue, they are not constrained by the 60-day deadline.

We disagree. Respecting a challenge under ORS 246.910(1) to the Secretary of State's constitutional evaluation of a proposed initiative measure, *Ellis* sets out a 60-day deadline, following certification of a ballot title. 302 Or at 19. As applicable to this case, that deadline expired in June 1999, 60 days after the Attorney General certified the ballot title for the initiative petition that ultimately became Measure 7. Consequently, the time for plaintiffs to have challenged the Secretary of State's constitutional evaluation of Measure 7, the underpinning of jurisdiction under ORS 246.910(1) for purposes of this case, long has passed.

*McCall* plaintiffs argue, as noted above, that *Ellis*—specifically, its 60-day deadline—should apply to only challenges brought before the election. That argument misses the broader point, that is, that the very *nature* of their challenge is a pre-election challenge to a pre-election Secretary of State decision. As this court explained in *Ellis*, 302 Or at 17:

"There is a season for each kind of challenge to the Secretary of State's administration of election laws, whether as to the ballot title, the signature gathering process[,] or constitutional evaluation. * * * The Secretary of State makes—or fails to make—the constitutional decision at the outset. * * * Later actions, such as acceptance of a ballot title from the Attorney General, verification of signatures and certification, do not call for [the Secretary of State] to reassess the original constitutional evaluation that is supposed to be

the predicate for placing the entire initiative machinery in operation. It is either done or not at this initial stage. The period of reasonable time commences then."

(Citations omitted.) The fact that *McCall* plaintiffs *filed* their action *after* the election does not save their challenge for jurisdictional purposes under ORS 246.910(1): The "season" for their challenge occurred *before* the election, within 60 days after the Attorney General certified the ballot title.[13] We conclude that the trial court did not have jurisdiction to hear *McCall* plaintiffs' challenge under ORS 246.910(1).[14]

## III. STANDING

### A. *Legal Principles Respecting Standing*

Having determined that the trial court appropriately assumed jurisdiction under the UDJA, we now turn to intervenor's argument that no plaintiff in either action had standing to challenge Measure 7 under that statutory scheme. Although we agree with intervenor respecting three *McCall* plaintiffs (McCall, MacPherson, and Swaim) and two *League* plaintiffs (individual plaintiffs Stein and Katz), we conclude that plaintiffs Lewis and Tipperman, among *McCall* plaintiffs, and the remaining *League* plaintiffs (local government plaintiffs) have standing to challenge Measure 7.

---

[13] Contrary to the assertion by the dissent, our holding does not in any way restrict a voter's ability, under ORS 246.910(1), to challenge any act or failure to act by the Secretary of State. 334 Or at 684 (Durham, J., concurring in part and dissenting in part). Neither do we "confine such challenges solely to the Secretary of State's *first* purported exercise of authority." *Id.* at 691 (emphasis in original). A voter simply must bring a challenge to the act at issue by the Secretary of State in a timely fashion in relation to when the Secretary of State acted. A voter may not bring such a challenge *under ORS 246.910(1)* more than 18 months later, as *McCall* plaintiffs did in this case.

[14] We note that, in *State ex rel Keisling v. Norblad,* 317 Or 615, 629, 860 P2d 241 (1993), this court referred to the type of challenge at issue in *Ellis* as a "pre-election challenge to the election process." That description was accurate, but was vulnerable to the interpretation that *McCall* plaintiffs give it in this case: Because *Ellis* concerned the timeliness of "pre-election" challenges only, "post-election" challenges do not have any time constraints. As discussed above, we reject that argument. Both the challenge at issue in *Ellis* and the challenge at issue here are, at bottom, challenges to the Secretary of State's pre-election constitutional evaluation of a proposed initiative petition.

The requirements for standing under the UDJA are set out in ORS 28.020:

"Any person * * * whose rights, status or other legal relations are affected by a constitution, statute, [or] municipal charter * * * may have determined any question of construction or validity arising under any such * * * constitution, statute, [or] municipal charter * * * and obtain a declaration of rights, status or other legal relations thereunder."

Additionally, ORS 28.130 defines the word "person" as used in the UDJA

"* * * to mean any person, partnership, joint stock company, unincorporated association or society, or municipal or other corporation of any character whatsoever."

Thus, to establish standing, a plaintiff must show that the plaintiff is a "person" as defined in ORS 28.130 and that the plaintiff's "rights, status or other legal relations are affected" by the law or enactment at issue.

■ In identifying the requisite "[e]ffect[ ]" to establish standing under ORS 28.020, this court has held that a plaintiff must show some injury or other impact upon a legally recognized interest beyond an abstract interest in the correct application or the validity of a law. *Eckles v. State of Oregon,* 306 Or 380, 385, 760 P2d 846 (1988). In addition, the plaintiff's showing of that injury or other impact must not be "too speculative." *Gruber v. Lincoln Hospital District,* 285 Or 3, 7, 588 P2d 1281 (1979).

■ With those requirements in mind, we turn to the evidence of injury or other impact that plaintiffs offered before the trial court. Because we are reviewing a grant of summary judgment, we view the facts and all reasonable inferences that may be drawn from them in favor of the nonmoving parties—in this case, the state and intervenor. *Robinson v. Lamb's Wilsonville Thriftway,* 332 Or 453, 455, 31 P3d 421 (2001).

B. *McCall Plaintiffs*

*McCall* plaintiffs' complaint included the following allegations that are relevant to our discussion:

"Plaintiffs are taxpayers and registered voters in Oregon. They voted in the November 7, 2000, general election. Some or all of them own land in areas that are subject to regulations restricting the use of private real property.

"Plaintiffs Swaim and Lewis are the Mayors of Salem and Jacksonville, respectively. Their official duties include deciding whether and how to enforce regulations that affect the value and use of private real property."

*McCall* plaintiffs also attached, as "Exhibit A" of their complaint, a copy of a page of the voters' pamphlet that included the text of Measure 7, its accompanying ballot title, and a brief estimate of financial impact.

 *McCall* plaintiffs argue that they all have standing as landowners because they oppose the increased development that Measure 7 would bring about. However, on summary judgment, *McCall* plaintiffs McCall, MacPherson, and Swaim rested upon the allegations of their complaint, set out above, and failed to allege or show that Measure 7 would lead to increased development, how it would do so, and how, specifically, that increased development would affect them as landowners. The only specific impact upon plaintiffs McCall, MacPherson, and Swaim as landowners that we can discern from the text of Measure 7 is that, generally speaking, landowners would be compensated for—or arguably might avoid altogether—certain governmental regulations of their private property. That impact is not sufficient to establish standing under ORS 28.020, because it is not sufficiently adverse, a quality that is central to the question of standing in any context. *See People for Ethical Treatment v. Inst. Animal Care*, 312 Or 95, 101, 817 P2d 1299 (1991) (so stating).[15]

_____

[15] *McCall* plaintiffs McCall, MacPherson, and Swaim also argue that they have standing as taxpayers and as voters; plaintiff Swaim further argues that he has standing as a "public official" as described by the Court of Appeals in *Multnomah County v. Talbot*, 56 Or App 235, 641 P2d 617 (1982), which opinion this court adopted as its own, *Multnomah County v. Talbot*, 294 Or 478, 657 P2d 684 (1983). We decline to address those arguments, other than to note our agreement with intervenor that, according to this court's case law describing those theories of standing, plaintiffs McCall, MacPherson, and Swaim have failed to establish it. *See Hanson v. Mosser*, 247 Or 1, 10-11, 427 P2d 97 (1967) (plaintiffs had standing as taxpayers, because they alleged that unlawful expenditures of public funds pursuant to questioned contract would increase their tax burden), *overruled on other*

■ By contrast, *McCall* plaintiffs Lewis and Tipperman submitted uncontroverted affidavits in which they offered details concerning how, specifically, Measure 7 would affect them.[16] In his affidavit, Lewis avers that (1) he is the Mayor of Jacksonville and owns property there; (2) he has made efforts—to date, successful—to prevent the conditional use of forest resource land outside Jacksonville as an aggregate mine; (3) he has been named as a defendant in a federal complaint filed by the owner of the forest resource land; (4) the forest resource landowner alleged in her federal complaint that, under Measure 7, she would be entitled to $50 million if Jackson County prevents her from using her land as an aggregate mine; (5) as a result of the litigation, Jacksonville is reconsidering its opposition to the aggregate mine; and (6) if the forest resource landowner succeeds in obtaining permission to mine her property, then the value of real estate in Jacksonville, including his own, will decrease.

■ Plaintiff Tipperman, a rancher who owns a large timber and cattle ranch in Union County, avers as follows in his affidavit:

"In my opinion, if the county or state were to repeal or 'waive' or otherwise not enforce land use law, to avoid liability for compensation under Measure 7, some surrounding and nearby parcels of land would be developed for residential and possibly commercial use. That would diminish the value of my farm, because those other uses and ranching are generally not compatible in close proximity to one another. Such development would also interfere with my ability to continue ranching and * * * would thus jeopardize a portion of my income.

"* * * * *

"If Measure 7 is adopted, the value and utility of [my] * * * ranch will be significantly diminished. * * * [R]ural

_____

*grounds by Smith v. Cooper,* 256 Or 485, 488, 475 P2d 78 (1970); *see also Webb v. Clatsop Co. School Dist. 3,* 188 Or 324, 328-29, 215 P2d 368 (1950) (plaintiffs had standing as voters, because they alleged that polls had closed one hour earlier than had been publicized, preventing one plaintiff from voting, and because, at polling place, one plaintiff improperly had been disqualified from voting).

[16] *McCall* plaintiffs initially submitted both affidavits to the trial court as evidence in support of their motion for a preliminary injunction. *McCall* plaintiffs specifically incorporated that evidence in their pleadings on their motion for summary judgment as evidence in support of that motion.

residences and hobby farms * * * will sprout on adjoining tracts of land, bringing dogs which will harass the livestock and wildlife on the [r]anch, and unending trespassing and poaching by my new found neighbors and their friends. There will be other adverse consequences including reduction of stream flows (which supply water for our livestock and fish) which are already at precariously low levels during the Summer and early Fall."

Although the consequences that plaintiffs Lewis and Tipperman anticipate are not certain to result from the implementation of Measure 7, they are plausible, concrete ramifications. Both plaintiffs Lewis and Tipperman introduced evidence that shows how Measure 7 would lead to increased development and how, specifically, that increased development would injure them. Because plaintiffs Lewis and Tipperman established that Measure 7 would affect their rights, status, or legal relations, we conclude that they have standing to challenge Measure 7 under ORS 28.020.

C. *League Plaintiffs*

*League* plaintiffs' complaint sets out the following allegations respecting standing:

"Plaintiffs City of Eugene, City of Portland, Junction City, City of Veneta, and City of Beaverton are municipal corporations with home rule powers granted by the Oregon Constitution. Plaintiffs Multnomah County, Benton County and Washington County are counties with home rule powers granted by the Oregon Constitution. Plaintiffs * * * Stein and * * * Katz are citizens of the State of Oregon, and electors and taxpayers."

*League* plaintiffs also attached the text of Measure 7, as well as its accompanying ballot title and a brief estimate of financial impact, as "Exhibit A" of their complaint. The estimate of financial impact provided:

"Direct costs to the state are estimated to be $1.6 billion per year. Local government direct costs are estimated to be $3.8 billion per year."

*League* plaintiffs did not submit affidavits in further support of their standing under ORS 28.020; consequently, the allegations in their complaint constituted the only material

respecting standing before the trial court on summary judgment.

As to the *League* plaintiffs Stein and Katz, as with *McCall* plaintiffs McCall, MacPherson, and Swaim, neither the allegations in the complaint nor the attached exhibit demonstrates how Measure 7 would affect them. Accordingly, they lack standing to bring this challenge.

The local government plaintiffs consist of municipal corporation (city) plaintiffs and county plaintiffs. In respect of the city plaintiffs, the UDJA specifically treats municipal (and all other) corporations as "persons" for purposes of the act. ORS 28.130. Accordingly, a city, like any person, has standing to bring an action under the UDJA if that city's "rights, status or other legal relations are affected." ORS 28.010. In respect of the county plaintiffs, this court has recognized that declaratory relief is available to counties under the UDJA. *See Tillamook Co. v. State Board of Forestry*, 302 Or 404, 416, 730 P2d 1214 (1986) (recognizing county's standing to bring declaratory judgment action against state).

■ When we examine the text of Measure 7 (Exhibit A of *League* plaintiffs' complaint), specifically, subsection (a), we see that, because cities and counties are forms of "local government" that "pass[ ] or enforce[ ] * * * regulation[s] that restrict[ ] the use of private real property," Measure 7 will have a fiscal impact upon any city or county each time that the city or county chooses to regulate real property in a manner that gives rise to a Measure 7 claim. That impact—officially estimated as a cost of 3.8 billion dollars to local governments generally—is not abstract. Thus, despite its few specific allegations, *League* plaintiffs' complaint demonstrates that Measure 7 will have a fiscal impact upon the local government plaintiffs. That impact is sufficient to show that Measure 7 will "affect[ ]" those plaintiffs' "legal relations" within the meaning of ORS 28.020. Accordingly, the local government plaintiffs have standing to challenge Measure 7 under the UDJA.[17]

---

[17] Intervenor also argues that all the local government plaintiffs lack standing because they are "mere instrumentalities of the state" and, therefore, may not "maintain an action against the state to strike down an initiative passed by the voters of the state." He argues that a local government must have a "proprietary

## IV. RIPENESS

■ The final issue that we must address before turning to the merits is the ripeness of the controversy. Intervenor argues that the controversy is not ripe because the Secretary of State has not yet completed canvassing the votes for and against Measure 7, and the Governor has not yet proclaimed that the measure has passed. However, the record includes uncontroverted evidence (the official county abstracts and the unofficial vote tally) that shows that a majority of the voters approved Measure 7 at the November 2000 general election. According to that evidence, the Secretary of State's canvass of the votes will not alter that result. Under those circumstances, plaintiffs'[18] challenge to Measure 7 is not premature, because the ultimate, official result clearly can be forecasted. *See Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982) (ORS chapter 28 requires controversy that "involve[s] present facts *as opposed to a dispute which is based on future events of a hypothetical nature*" (emphasis added)); *Hale v. Fireman's Fund Ins. Co. et al*, 209 Or 99, 103-04, 302 P2d 1010 (1956) (request for declaratory relief not ripe if contingent upon happening of event that cannot be forecast and may never take place). Accordingly, we conclude that this controversy is ripe. We now turn to the merits.

## V. ARTICLE XVII, SECTION 1

A. *Legal Principles Respecting Article XVII, Section 1, and Parties' Contentions*

■ As noted earlier, the trial court concluded that Measure 7 violated the separate-vote requirement of Article XVII, section 1, which provides, in part:

interest" at stake before it may request relief under the UDJA. In support of that contention, intervenor relies upon *Tillamook Co.*, 302 Or 404. In *Tillamook Co.*, however, this court specifically rejected the argument that intervenor makes here, that is, that "local governments" do not have standing to bring such challenges because they are " 'mere instrumentalities of the state.' " *Id.* at 415. This court instead focused upon whether the county in that case had any "protected, recognizable" interest that could be asserted against the state. *Id.* at 416. We have engaged in a similar inquiry here and have concluded that the local government plaintiffs have such an interest, which is sufficient to establish standing under ORS 28.020.

[18] In light of our conclusion that only plaintiffs Lewis and Tipperman, among *McCall* plaintiffs, and the local government plaintiffs, among *League* plaintiffs, sufficiently alleged standing under ORS 28.020, we use the term "plaintiffs" to refer to only those plaintiffs for the remainder of this opinion.

"When two or more amendments shall be submitted * * * to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

The trial court relied, in part, upon *Armatta v. Kitzhaber*, 327 Or 250, 277, 959 P2d 49 (1998), in which this court concluded that, to determine whether a measure denominated as a single amendment actually contained "two or more amendments" for constitutional purposes, a court must determine "whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related." This court recently reaffirmed that holding in *Lehman v. Bradbury*, 333 Or 231, 242, 37 P3d 989 (2002).

The state and intervenor contend, at the outset, that Measure 7 makes only one substantive "change" under the first part of the *Armatta* inquiry and, consequently, that further analysis under Article XVII, section 1, is unnecessary. Alternatively, the state and intervenor contend that, even if Measure 7 makes more than one substantive change to the Oregon Constitution, those changes are "closely related." In response, plaintiffs contend that the trial court correctly concluded that Measure 7 contravened the separate-vote requirement because the measure made multiple, substantive changes to the Oregon Constitution that were not closely related.

## B. *Changes Made by Measure 7*

We begin by addressing certain of the substantive changes that plaintiffs contend that Measure 7 makes to the Oregon Constitution. As noted above, plaintiffs first contend that, by its express terms, Measure 7 substantively changes Article I, section 18. The state and intervenor agree, as do we. The parties disagree, however, concerning the effect of Measure 7 upon other parts of the Oregon Constitution, including Article I, section 8. Below, we first briefly summarize the effect of Measure 7 upon Article I, section 18, and then turn to the effect that Measure 7 has upon Article I, section 8.[19]

_____

[19] Plaintiffs further contend that Measure 7 changes Article VI, section 10, Article XI, section 2, and Article IV, section 1(5) (all regarding home-rule authority

## 1. *Article I, Section 18*

Article I, section 18, provides, in part:

"Private property shall not be taken for public use * * * without just compensation; nor except in the case of the state, without such compensation first assessed and tendered; provided, that the use of all roads, ways and waterways necessary to promote the transportation of the raw products of mine or farm or forest or water for beneficial use or drainage is necessary to the development and welfare of the state and is declared a public use."

That provision requires payment of "just compensation" for a variety of governmental actions that result in the "taking" of private property for public use, including "regulatory" takings by way of application or enforcement of regulations with certain economic ramifications. *Boise Cascade Corp. v. Board of Forestry*, 325 Or 185, 197-98, 935 P2d 411 (1997).

Measure 7 explicitly amends Article I, section 18, as follows:

"BE IT ENACTED BY THE PEOPLE OF THE STATE OF OREGON:

"THE CONSTITUTION OF THE STATE OF OREGON IS AMENDED BY ADDING THE FOLLOWING SUBSECTIONS TO SECTION 18 OF ARTICLE I:

"(a) If the state, a political subdivision of the state, or a local government passes or enforces *a regulation that restricts the use of private real property, and the restriction has the effect of reducing the value of a property upon which the restriction is imposed*; the property owner shall be paid just compensation equal to the reduction in the fair market value of the property.

---

and related initiative and referendum powers); Article XI, sections 7 and 10 (state and county debt limitations); Article XI, section 15(1) (unfunded mandates); Article IV, section 1(1) (legislative authority); Article VII (Amended), section 1 (judicial power); Article III, section 1 (separation of powers); and Article I, section 39, and Article XI, section 2 (local option). In light of our analysis respecting Article I, section 8, set out below, we need not address plaintiffs' contentions that Measure 7 also changes several other provisions of the Oregon Constitution. *See Swett*, 333 Or at 607 (following same approach).

"(b) For purposes of this section, adoption or enforcement of historically and commonly recognized nuisance laws shall not be deemed to have caused a reduction in the value of a property. The phrase 'historically and commonly recognized nuisance laws' shall be narrowly construed in favor of a finding that just compensation is required under this section.

"(c) A regulating entity may impose, to the minimum extent required, a regulation to implement a requirement of federal law without payment of compensation under this section. Nothing in this 2000 Amendment shall require compensation due to a government regulation prohibiting the use of a property for the purpose of selling pornography, performing nude dancing, selling alcoholic beverages or other controlled substances, or operating a casino or gaming parlor.

"(d) Compensation shall be due the property owner if the regulation was adopted, first enforced or applied after the current owner of the property became the owner, and continues to apply to the property 90 days after the owner applies for compensation under this section.

"(e) Definitions: For purposes of this section, 'regulation' shall include any law, rule, ordinance, resolution, goal, or other enforceable enactment of government; 'real property' shall include any structure built or sited on the property, aggregate and other removable minerals, and any forest product or other crop grown on the property; 'reduction in the fair market value' shall mean the difference in the fair market value of the property before and after application of the regulation, and shall include the net cost to the landowner of an affirmative obligation to protect, provide, or preserve wildlife habitat, natural areas, wetlands, ecosystems, scenery, open space, historical, archaeological or cultural resources, or low income housing; and 'just compensation' shall include, if a claim for compensation is denied or not fully paid within 90 days of filing, reasonable attorney fees and expenses necessary to collect the compensation.

"(f) If any phrase, clause, or part of this section is found to be invalid by a court of competent jurisdiction, the

remaining phrases, clauses and parts shall remain in full force and effect."

(Emphasis added.) As its text demonstrates, Measure 7 explicitly changes Article I, section 18, in a number of ways. Most significantly, Article I, section 18, currently requires payment of just compensation only when a property owner demonstrates that a governmental regulation has "deprive[d] the owner of *all* economically viable use of the property. * * * If the owner has some substantial beneficial use of the property remaining, then the owner fails to meet the test." *Boise Cascade Corp.*, 325 Or at 197-98 (internal quotation marks and citations omitted; emphasis added); *see also Dodd v. Hood River County*, 317 Or 172, 181-82, 855 P2d 608 (1993) (to same effect). After amendment by Measure 7, Article I, section 18, would require payment of just compensation for *any* reduction in the value of private real property resulting from the enforcement of a restrictive regulation, even that which falls short of the standard set out in *Boise Cascade Corp.* and *Dodd*.

Although Measure 7 changes Article I, section 18, in other ways, and although the parties disagree regarding the extent and ramifications of such changes, we need not discuss such changes here. That is so, because we conclude below that Measure 7 also implicitly changes Article I, section 8, in a substantive way and that the explicit, substantive change to Article I, section 18, discussed above, is not closely related to the implicit change that Measure 7 makes to Article I, section 8. Accordingly, the number of other changes that Measure 7 makes to Article I, section 18, has no bearing upon our decision in this case. *See Swett*, 333 Or at 607 (because court addressed two substantive changes that were not closely related, unnecessary to discuss other changes made by measure at issue).[20] We turn to our analysis of the effect of Measure 7 upon Article I, section 8.

---

[20] We note that the trial court based its conclusion that Measure 7 violated the separate-vote requirement primarily upon its determination that Measure 7 made various changes to Article I, section 18. However, that court relied upon the Court of Appeals' "necessar[y] impl[ication]" construct, set out in *Dale v. Keisling*, 167 Or App 394, 401, 999 P2d 1229 (2000), for determining whether a measure encompasses two or more amendments. This court later rejected that construct in *Lehman*, 333 Or at 241-42. The trial court also relied upon an alternative "policy choice" construct advocated by the state, which this court also rejected in *Lehman*, *id.* at 242.

## 2. *Article I, Section 8*

Plaintiffs contend that subsection (c) of Measure 7 changes Article I, section 8. We address that argument by first turning again to the text of Measure 7.

As noted above, in subsection (a), Measure 7 requires payment of just compensation for restrictive regulations that reduce the value of private real property. Subsection (c) of Measure 7, however, creates the following exception to the just-compensation requirement set out in subsection (a):

> "Nothing in this 2000 Amendment shall require compensation due to a government regulation prohibiting the use of a property for the purpose of selling pornography, performing nude dancing, selling alcoholic beverages or other controlled substances, or operating a casino or gaming parlor."

In other words, subsection (c) permits the state and local governments *not* to pay a claim that otherwise would qualify under subsection (a), if that claim is made in response to a regulation that forbids using the subject property for one of the enumerated purposes. By its terms, then, subsection (c) permits the state and local governments not to pay just compensation for regulations that explicitly prohibit using property for those purposes, even if such regulations reduce property value under subsection (a).

Plaintiffs contend that, because subsection (c) permits the state or a local government not to pay just compensation to private real property owners whose property decreases in value because of a regulation prohibiting the use of property for, among other uses, the purpose of selling pornography, Measure 7 changes the right to free expression currently guaranteed by Article I, section 8. The state and intervenor respond that subsection (c) merely creates an exception to the right to just compensation set out in subsection (a) and, viewed in that way, does not change rights currently guaranteed by Article I, section 8. Alternatively, intervenor contends that, if subsection (c) does operate to prevent certain property owners from receiving payment of just compensation, such a scheme never could be enforced, because it would not be permitted under Article I, section 8. Therefore,

in intervenor's view, Measure 7 effectively could not "change" Article I, section 8, because that constitutional provision would prevent subsection (c) from becoming effective in the first instance. As explained below, we agree with plaintiffs.

Article I, section 8, in place since statehood, provides, in part:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever[.]"

As this court explained in *City of Portland v. Tidyman*, 306 Or 174, 179, 759 P2d 242 (1988), Article I, section 8, "forbids the enactment of a law directed in terms against any subject of speech, writing, or printing," unless the communication in question falls within "a well-established historical exception that the constitutional guarantees demonstrably were not meant to displace."

There is no suggestion in the text of Measure 7 that the term "pornography" is used in other than its ordinary sense. So understood, it is clear that pornography is one form of "speech, writing, or printing." *Tidyman*, 306 Or at 179. Further, this court has determined that restrictions upon sexually explicit and obscene expression involving adults—such as many forms of pornography—do not fit within any historical exception. *State v. Henry*, 302 Or 510, 523, 732 P2d 9 (1987). Therefore, the term "pornography," as used in subsection (c), includes some forms of expression that, no matter how offensive to many people, are protected under Article I, section 8.

The state and intervenor do not quarrel with the foregoing statement of Oregon constitutional law. Neither do they disagree that the use of property "for the purpose of selling pornography," as described in subsection (c), implicates the right of free expression. Instead, as noted, the state and intervenor argue that subsection (c) does not change that right because it does not take away any benefit that property owners who use their property to sell pornography *currently* enjoy. That is, such property owners would not be entitled to just compensation for the type of regulation described in subsection (c) today, and they would not be entitled to it under

Measure 7. Therefore, according to the state and intervenor, Measure 7 would not change those owners' right of free expression.

The state's and intervenor's argument mistakenly focuses upon whether property owners who use their property to sell pornography actually would lose money under Measure 7. That is not the question. The question is whether those owners would experience any change in the constitutional right to free expression to which they currently are entitled under Article I, section 8. We turn to that question now.

 As we have explained, as it currently operates, Article I, section 8, prohibits the state or a local government from enacting a law that is directed against the content of constitutionally protected expression. *Tidyman*, 306 Or at 179. Thus, the state or a local government may not enact a law that is directed against the selling of pornography because it is pornography. *Id.* However, the protection afforded by Article I, section 8, does not end with the protection from regulations that explicitly target expression. As this court explained in *City of Eugene v. Miller*, 318 Or 480, 491, 871 P2d 454 (1994), freedom of expression as guaranteed by Article I, section 8, also means that the state or a local government may not treat those who sell expressive material "more restrictively" than those who sell other merchandise. Because *Miller* is crucial to understanding the scope of the freedom of expression that Article I, section 8, guarantees, we briefly discuss that case here.

*Miller* concerned a bookseller's challenge to a city ordinance that prohibited the sale of most forms of merchandise on city sidewalks, except (by license) the sale of "food, beverages, flowers or balloons." 318 Or at 483. On its face, the ordinance targeted neither expression generally nor any particular type of expression. Stated differently, in the words of *Tidyman*, 306 Or at 179, the ordinance was not explicitly "directed in terms against any subject of speech." However, the ordinance operated to restrict the bookseller—someone who sold expressive material protected under Article I, section 8—to a greater extent than it did those who sold food,

beverages, flowers, and balloons. That restriction, this court held, violated Article I, section 8. The court explained:

> "So long as the city chooses to make its sidewalks available for *some* general commercial activity * * *, it may not treat a vendor of expressive material more restrictively than vendors of other merchandise * * *."

318 Or at 491 (emphasis in original).

*Miller* demonstrates that a governmental burden upon free expression is one type of "restrain[t]" of expression that Article I, section 8, prohibits. It is equally clear under *Miller* that a governmental enactment that allows some persons to participate in a certain activity, but prohibits others engaged in expression from participating in that same activity, constitutes a prohibited burden upon expression.[21] It follows that a governmental scheme that requires payment to some persons, but not others engaged in protected expression, also constitutes a burden that Article I, section 8, prohibits. For that reason, today, if the state or a local government is required to offer a benefit to some property owners, it may not, under Article I, section 8, choose *not* to offer that same benefit to another property owner because that latter owner engages in a particular type of expressive activity.[22]

Under Measure 7, by contrast, the state and local governments explicitly would be permitted to do just that,

---

[21] This court noted in *Miller* that such an enactment might be permissible under Article I, section 8, if, in the context of vendors of merchandise, it were accompanied by an explanation as to how the sale of the nonexpressive material in question "meets a special need or how the sale of the expressive material in question gives rise to special problems reasonably justifying the regulation of the vendor of expressive material differently and more stringently than other vendors." 318 Or at 491. No such "justification" or "special problems" appear here.

[22] We note that, in both *Miller* and *Tidyman*, this court explained that such disparate treatment of persons engaged in expression implicates Article I, section 8, rather than Article I, section 20:

> " 'We note at the outset that the obstacle to the city's distinction [between 'adult' businesses and other businesses] is not the constitutional guarantee of equal privileges and immunities, Article I, section 20, but the guarantee of free expression, Article I, section 8. If free expression within that guarantee were not involved, 'adult' businesses could not insist that they must be treated exactly like any other business, not, at least, without a showing of being singled out for an impermissible motive.' "

*Miller*, 318 Or at 487 (quoting *Tidyman*, 306 Or at 182) (brackets added in *Miller*; *Tidyman* footnotes omitted in *Miller*).

*i.e.*, they could decline to pay just compensation under Article I, section 18, to a property owner because that owner engages in a particular type of expressive activity, namely, the sale of some forms of pornography. Stated differently, subsection (c) operates to permit the state and local governments to choose not to pay such a property owner, unless that owner were to change the content of the expressive material sold on the property in question—essentially placing a price tag upon the property owner's right of free expression. Consequently, subsection (c) changes—indeed, limits—the scope of the rights currently guaranteed by Article I, section 8. For that reason, we reject the state's and intervenor's argument that subsection (c) does not constitute a constitutional "change" for purposes of our separate-vote analysis.

Intervenor also contends that, because regulations directed toward constitutionally protected expression—such as those that, under subsection (c), would "prohibit[ ] the use of a property for the purpose of selling pornography"—are impermissible under Article I, section 8, the exception to the just-compensation requirement set out in subsection (c) never could be enforced and, consequently, cannot be deemed a constitutional "change" for purposes of Article XVII, section 1. Again, we disagree.

We first note that, in *Tidyman*, 306 Or at 185, 188, 190-91, this court left open the possibility that a regulation ostensibly directed against expression might pass constitutional muster, provided that such a regulation in fact was directed toward negative effects sought to be prevented and also specified the harm that otherwise would arise if the regulation were not adopted. Consequently, although this court has not yet decided a case involving such a regulation, it is possible that a governmental entity, today, could craft a regulation that "prohibit[s] the use of a property for the purpose of selling pornography" without running afoul of Article I, section 8.

That said, we disagree with intervenor's theory that a constitutional change that never might be enforced is not a "change" for separate-vote purposes. Subsection (c), as of the moment of its passage, carves out an explicit constitutional

exception to the protection that Article I, section 8, now provides. Stated differently, subsection (c) sets out a circumstance, effective as of the effective date of Measure 7, in which the state and local governments constitutionally must provide a benefit to some property owners, but may decline to offer it to other property owners who use their property to sell a type of expressive material that is protected under Article I, section 8. Regardless of whether the state or a local government ever chooses to take advantage of the exception set out in subsection (c), that exception nevertheless is a "change" to the scope of the rights currently guaranteed by Article I, section 8, for purposes of our separate-vote analysis in this case. *See generally Lehman*, 333 Or at 243 n 8 (fact that one constitutional change made by measure at issue was prohibited by United States Constitution did not affect court's separate-vote analysis).

In sum, although the text of Measure 7 purports to change only Article I, section 18, its inclusion of the exception set out in subsection (c) nonetheless changes rights currently guaranteed by Article I, section 8. *See generally Coalition for Equit. School Fund. v. State of Oregon*, 311 Or 300, 309, 811 P2d 116 (1991) ("When a party argues that a general constitutional provision forbids the state from doing something, the argument may be answered by a later-adopted constitutional provision that allows the state to do that very thing."). For those reasons, we conclude that, as written, Measure 7 substantively changes two existing constitutional provisions: Article I, section 18 (takings), and Article I, section 8 (freedom of expression).

C. *Analysis of Measure 7 under Article XVII, Section 1*

As noted above, our inquiry under *Armatta*, 327 Or at 277, is to determine whether Measure 7 makes "two or more changes" to the Oregon Constitution that are "substantive" and are not "closely related." The foregoing analysis establishes that Measure 7 makes at least two substantive changes to the existing constitution, that is, a change to the requirements for payment of just compensation to property owners under Article I, section 18, and a separate change

respecting laws restraining expression under Article I, section 8. We turn, then, to application of *Armatta's* "closely related" prong.

In *Lehman*, 333 Or at 246, this court offered a further explanation as to application of the phrase "closely related" from *Armatta*:

> "* * * First, we examine the relationship among the constitutional provisions that the measure affects, both explicitly and implicitly. If the affected provisions of the existing constitution themselves are not related, then it is likely that changes to those provisions will offend the separate-vote requirement. * * * [T]he fact that a proposed amendment asks the people, in one vote, substantively to change multiple provisions of the Oregon Constitution that are not themselves related is one indication that the proposed amendment might violate the separate-vote requirement.
>
> "Next, we must consider the constitutional changes themselves. * * * If they are closely related, the measure under consideration survives scrutiny under Article XVII, section 1. If they are not, it does not."

Following that approach, we proceed to analyze the relationship between the two existing constitutional provisions affected by Measure 7, as well as the relationship between the substantive constitutional changes that the measure effects.

As to the constitutional provisions that Measure 7 affects—Article I, section 18, and Article I, section 8—we have no difficulty concluding that, other than their placement in the Bill of Rights, those provisions bear no relation to each other. Article I, section 18, provides a right to "just compensation" to private property owners whose property is taken for public use. Article I, section 8, by contrast, expressly precludes, as to any person, any restriction upon the "free expression of opinion," as well as upon "the right to speak, write, or print freely on any subject whatever." Those two constitutional provisions involve "separate constitutional rights, granted to different groups of persons." *Armatta*, 327 Or at 283. That lack of relationship "is a strong indication that those provisions are not 'related' for purposes

of the separate-vote requirement." *Lehman*, 333 Or at 246 n 9.

Turning to the constitutional changes themselves, we conclude that the change that Measure 7 makes to Article I, section 18, that is, an expanded just-compensation requirement for restrictive regulations that reduce the value of private real property, is not closely related to the change that it makes to Article I, section 8, that is, creating an exception to the historical requirement that laws cannot treat those engaged in expressive activity "more restrictively" than others not engaged in expressive activity, *Miller*, 318 Or at 491. The change to Article I, section 18, generally concerns the ability of a real property owner to obtain just compensation for enforcement of certain regulations—indeed, that change generally *expands* the rights of property owners *vis-à-vis* the government in that regard. By contrast, the change that Measure 7 makes to Article I, section 8, operates to *limit* the rights of certain property owners, *vis-à-vis* other property owners, based upon the content of the expressive material sold on their property. More notably, the change that Measure 7 makes to Article I, section 8, carves out an exception to the fundamental principle that no law shall restrict expression "on any subject whatever." *See Henry*, 302 Or at 515 (Article I, section 8, broadly covers "any expression of opinion" on "any subject whatever," without exception). By incorporating both types of substantive changes that are not closely related, Measure 7 makes "two or more amendments" to the Oregon Constitution that the voters were required to have voted upon separately.

D. *Measure 7 is Invalid in its Entirety*

 As this court explained in *Armatta*, 327 Or at 284, and again in *Lehman*, 333 Or at 250-51, a proposed constitutional amendment must be adopted in compliance with constitutional requirements:

> "It is a long-standing principle of law that a proposed constitutional amendment must be adopted in compliance with the procedures set forth in the Oregon Constitution:
>
> " 'The provisions of the constitution for its own amendment are mandatory, and must be strictly observed. *A*

> *failure in this respect will be fatal to a proposed amendment, notwithstanding it may have been submitted to and ratified and approved by the people.* The constitutional provisions are as binding upon the people as upon the legislative assembly, and the people cannot give legal effect to an amendment which was submitted in disregard of the limitations imposed by the constitution * * *. * * * *If* * * * *an attempt is made to amend an existing constitution, its every requirement regarding its own amendment must be substantially observed, and the omission of any one will be fatal to the amendment.* The constitution is the supreme law of the land, binding upon all, and can no more be disregarded in the manner of its own amendment than in any other respect. As long as it remains, its provisions must be observed.' "

*Armatta*, 327 Or at 284-85 (quoting *Kadderly v. Portland*, 44 Or 118, 135-36, 74 P 710, *on reh'g*, 75 P 222 (1904)) (emphasis and ellipses in *Armatta*). Accordingly, because Measure 7 was not adopted in compliance with the requirements of Article XVII, section 1, we hold that it is void in its entirety.

## VI. ATTORNEY FEES

█ Finally, we address the issue of attorney fees. As noted at the outset of this opinion, *McCall* plaintiffs, but not *League* plaintiffs, specifically requested attorney fees in their complaint. After the trial court entered its ruling below, *McCall* plaintiffs petitioned for attorney fees, and the state objected. From our review of the record, it appears that the trial court never ruled on plaintiffs' petition or on the state's objection. For that reason, and because the issue of attorney fees further will involve consideration of our holding that only plaintiffs Lewis and Tipperman sufficiently alleged standing in the *McCall* case, we remand the case to the trial court for further proceedings.

## VII. CONCLUSION

In sum, we hold that (1) the trial court did not err in assuming jurisdiction under the UDJA; (2) the trial court did not have jurisdiction under ORS 246.910(1); (3) plaintiffs Lewis, Tipperman, and the local government *League* plaintiffs, but not the remaining *McCall* plaintiffs or *League* plaintiffs, established standing for purposes of the UDJA; (4) the

controversy is ripe for adjudication; (5) Measure 7 encompasses two amendments to the Oregon Constitution in violation of Article XVII, section 1, and, therefore, is void in its entirety; and (6) the case must be remanded to the trial court.

The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

**DURHAM, J.,** concurring in part and dissenting in part.

I write separately, because I do not agree with all the majority's reasoning and conclusions. Specifically, the majority misconstrues ORS 246.910(1) in concluding that the trial court had no jurisdiction under that statute to consider the claims of the individual plaintiffs Audrey McCall, Hector MacPherson, and Michael E. Swaim in the *McCall* case, and Vera Katz and Bev Stein in the *League of Oregon Cities* case (hereinafter referred to collectively as "individual plaintiffs"). For the reasons set out below, ORS 246.910(1) supports the trial court's assumption of jurisdiction over the individual plaintiffs' claims.

## OVERVIEW OF APPEAL REMEDY
## PROVIDED BY ORS 246.910

ORS 246.910 provides:

"(1) A person adversely affected by any act or failure to act by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law, or by any order, rule, directive or instruction made by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law, may appeal therefrom to the circuit court for the county in which the act or failure to act occurred or in which the order, rule, directive or instruction was made.

"(2) Any party to the appeal proceedings in the circuit court under subsection (1) of this section may appeal from the decision of the circuit court to the Court of Appeals.

"(3) The circuit courts and Court of Appeals, in their discretion, may give such precedence on their dockets to

appeals under this section as the circumstances may require.

"(4) The remedy provided in this section is cumulative and does not exclude any other remedy against any act or failure to act by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law or against any order, rule, directive or instruction made by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law."

That statute provides a nonexclusive remedy, in the form of an appeal to the circuit court, for virtually any conduct by the Secretary of State, and an array of local election officials, that falls short of the requirements of Oregon election law or any official decision relating to elections made pursuant to delegated authority.

Subsection (1) of the statute identifies two broad categories of conduct by election officials that an appeal may challenge. The first category is "any act or failure to act by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law * * *." The second category is "any order, rule, directive or instruction made by the Secretary of State, a county clerk, a city elections officer or any other county, city or district official under any election law * * *."

Subsection (1) provides that, to bring an appeal, a plaintiff must be "adversely affected by" conduct that falls into either one or both of the categories described above. In this proceeding, all individual plaintiffs allege that they are either "registered voters" or "electors." Therefore, in challenging the Secretary of State's conduct in advancing Measure 7 to a public vote and in canvassing the ballots after the election on November 7, 2000, the individual plaintiffs satisfy the criterion that, the majority agrees, confers standing to sue under ORS 246.910(1). 334 Or at 654-55 n 9 (citing *Ellis v. Roberts*, 302 Or 6, 10-11, 725 P2d 886 (1986)). I discuss the individual plaintiffs' claims and the correct legal interpretation of the statute in greater detail later in this opinion.

The appeal that ORS 246.910(1) provides is a significant remedy. By filing an appeal under that statute, a registered voter can focus prompt judicial scrutiny on the conduct of election officials to make certain that every action or inaction of those officials complies in all respects with the requirements of Oregon election law.

## THE CHALLENGED CONDUCT OF THE SECRETARY OF STATE

The issue is whether the individual plaintiffs' complaints state facts that constitute a claim within the circuit court's jurisdiction under ORS 246.910(1). The majority acknowledges that the allegations in the *McCall* complaint refer to four acts by the Secretary of State that contravene Oregon election law: (1) accepting the proposed petition; (2) verifying that the petition contained the requisite number of signatures; (3) certifying the measure for placement on the ballot; and (4) after the election, deciding to canvas and beginning to canvass the votes for and against Measure 7. *Id.* at 654. The allegations in the *League of Oregon Cities* complaint substantively are identical.[1]

The majority does not address the court's jurisdiction under ORS 246.910(1) over the four acts, or failures to act, by the Secretary of State that the complaints allege. Instead, at the state's suggestion, the majority adopts a reformation of the complaints that leaves the allegations in a state that the individual plaintiffs scarcely would recognize. For example, the majority states that, "*McCall* plaintiffs agree that the Secretary of State's constitutional evaluation

---

[1] Because the facts alleged in the two complaints substantively are identical, I address the sufficiency of the complaints together. The *League of Oregon Cities* complaint ultimately requested a declaration, among other things, that Measure 7 is not valid because it violated the separate-vote requirement in Article XVII, section 1, of the Oregon Constitution, *see* ORS 28.020 (describing court authority to grant declaratory relief). Notwithstanding that request for a declaration of the invalidity of Measure 7, we determine the sufficiency of a complaint by examining the allegations of the complaint, not the labels used to characterize the claim. *Sheets v. Knight*, 308 Or 220, 232, 779 P2d 1000 (1989) ("While a claim for relief may fail to plead a specific theory, it should not be dismissed if it pleads a claim for relief under some theory, even if it was not the one the plaintiff intended." (Footnote omitted.)). Applying that rule here, the court may not reverse the trial court's assumption of jurisdiction if the allegations of the complaints are sufficient to plead a claim for relief under some theory, including the claim identified in ORS 246.910(1).

of the proposed initiative petition that became Measure 7 is the 'act' at the heart of this challenge." *Id.* at 655.

The record contains *no genuine agreement* by the individual plaintiffs to abandon reliance on three of the four factual allegations on which they base their actions. When fairly read, the complaints contend that *each* of the Secretary of State's four alleged acts or failures to act, from the earliest to the most recent, contravenes Oregon election law because, among other things, Measure 7 improperly presented multiple constitutional changes to the voters but packaged them for a single vote. The individual plaintiffs did not waive their complaints about the Secretary of State's more recent actions—including the canvassing of the votes on Measure 7 after the election—merely because they also argued that the Secretary of State never should have accepted the proposed petition in the first place. In my view, the majority errs in determining jurisdiction under ORS 246.910(1) by considering only one of the Secretary of State's alleged acts or failures to act in violation of Oregon election law.

After effectively reforming the complaints and concluding that, in reality, they challenge only the Secretary of State's April 1999 initial evaluation of the proposed initiative, the majority concludes, under *Ellis*, that the individual plaintiffs' opportunity to challenge that act under ORS 246.910(1) expired in June 1999. What the majority omits from its analysis is a consideration of the text and context of ORS 246.910. The sole case on which the majority relies, *Ellis*, similarly failed to construe and apply ORS 246.910. As the following discussion demonstrates, unless this court is willing to enforce the legislature's appeal remedy under ORS 246.910 as the legislature intended, the public will suffer the loss of an important protection against unauthorized conduct by elections officials.

DETERMINING THE MEANING OF ORS 246.910

The question whether ORS 246.910 authorized the trial court to assume jurisdiction over the individual plaintiffs' complaints requires this court to determine the intention of the legislature. In making that inquiry, this court first examines the text and context of the relevant statute. Context includes the provisions of other related statutes and case

law that construes the meaning of the statute at issue. If those sources disclose the clear meaning of the statute in question, this court proceeds no further. *State v. Toevs*, 327 Or 525, 532, 964 P2d 1007 (1998).

ORS 246.910(1) begins with the phrase "[a] person adversely affected * * *." That phrase describes those persons with standing to seek the statutory appeal remedy, and, as we already have seen, it includes persons, including the individual plaintiffs, who are registered voters or electors. *Ellis*, 302 Or at 11. Neither the majority nor any party questions that proposition.

ORS 246.910(1) then describes the two categories of conduct that an adversely affected person may appeal. As pertinent to this case, the categories are (1) "any act or failure to act by the Secretary of State * * * under any election law" and (2) "any order, rule, directive or instruction made by the Secretary of State * * * under any election law * * *."

The word "any" appears four times in subsection (1). The ordinary meaning of that word is "one indifferently out of more than two : * * * one, no matter what one : EVERY * * * : ALL * * *." *Webster's Third New Int'l Dictionary* 97 (unabridged ed 1993).

Applying those definitions in this context, the scope of the first category of appealable conduct in subsection (1) is broad to the point of being without limit. The phrase "any act or failure to act" embraces *every* "thing done," "deed," or "decision," *id.* at 20 (defining "act"), as well as every "omission of performance of an action or task; * * * neglect of an assigned, expected, or appropriate action * * * FAILING, LAPSE * * * DEFICIENCY * * *." *Id.* at 815 (defining "failure"). The phrase "any act or failure to act" sweeps within its scope each of the four acts or failures to act by the Secretary of State, described above, that the individual plaintiffs allege as the basis of their complaint.

The second category of appealable conduct in subsection (1) includes any "order" or "rule," two kinds of legal action that the legislature has exposed to judicial review under the Administrative Procedures Act (APA), ORS 183.310 to 183.550. *See* ORS 183.400 (providing for judicial

determination of validity of administrative rule); ORS 183.480-183.490 (providing for judicial review of administrative orders). However, the appeal remedy under ORS 246.910(1) is broader in scope than judicial review under the APA. For example, the definition of "rule" in ORS 183.310(8) includes an agency "directive" if it is "of general applicability" and "implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency[,]" but excludes certain "internal management directives" that "do not substantially affect the interests of the public" in relations between or within agencies. The remedy in ORS 246.910(1) extends to *any* "directive," as well as *any* "instruction" of the Secretary of State under any election law. Moreover, the fact that the APA exposes "orders" and certain "rules" to judicial review does not diminish the remedy of appeal described in ORS 246.910(1), because ORS 246.910(4) provides that the remedy of appeal is "cumulative" of any other remedy. This court drove home that point in *OEA v. Roberts*, 301 Or 236, 721 P2d 837 (1986), in which this court held that, because the Secretary of State's conduct in approving a proposed initiative for circulation was reviewable under ORS 246.910, the question whether ORS 183.482 also afforded judicial review of the same decision was moot.

The foregoing discussion indicates that the text of ORS 246.910(1) clearly supports the view that the legislature authorized the circuit court to review every official action by the Secretary of State regarding Measure 7. Thus, according to the statutory text, every exercise of the Secretary of State's official power over Measure 7 is subject to judicial review for conformity with Oregon election laws, including those that establish the scope of the Secretary of State's delegated authority over initiative petitions. Because that statute exposes every act or failure to act to a statutory appeal, it is unavailing to contend that a party's challenge to a recent exercise of the Secretary of State's authority, such as the canvassing of ballots, also could have been filed against some earlier exercise of authority over the same initiative petition.

This court's case law construing ORS 246.910(1) confirms the legislature's intention to authorize the circuit court to consider challenges to *all* actions or failures to act by the Secretary of State under any election law. In *OEA v. Roberts*,

301 Or 228, 721 P2d 833 (1986), the plaintiffs brought an action under ORS 246.910 to compel the Secretary of State and the Attorney General not to process a proposed initiative petition and to prevent the sponsors from circulating it. The plaintiffs contended that the Secretary of State had a duty to determine before the election whether the proposed initiative complied with the "one-subject" rule stated in Article IV, section 1(2)(d), of the Oregon Constitution. *Id.* at 230. The Secretary of State argued that that duty arose only after the election and that she had no duty, before the voters adopted an initiative measure, to examine a proposed initiative for compliance with the one-subject provision. The court had left that question open in an earlier case, *State ex rel Fidanque v. Paulus*, 297 Or 711, 688 P2d 1303 (1984).

The court determined that the Secretary of State did have a duty, before an election, to determine whether a proposed initiative addressed only one subject. The court also reviewed the various decisions that the Secretary of State must make on a proposed initiative in the months leading up to an election and stated: "The submission process thus contains *several discrete decisions by the Secretary, any one of which may be challenged." OEA*, 301 Or at 234 (emphasis added). *See also State ex rel Fidanque*, 297 Or at 716 n 5 ("Therefore, in the submission process, a series of decisions must be made. As each decision is made, it becomes susceptible to challenge.").

The court then turned to the question whether the particular decision that the plaintiffs had challenged—the approval of the prospective petition for circulation—was a proper occasion for a challenge under the one-subject rule. The court agreed with the plaintiffs that a one-subject challenge at that stage was proper because

" '[i]t is this determination that provides the first opportunity for the Secretary of State to exercise her official power with respect to the prospective petition. If, as the Plaintiffs-Relators contend, there is a constitutional duty to act, it would arise at this time. It is in approving a prospective petition which did not comply with the alleged requirements of Article IV, section 1, that the Secretary of State's authority under the constitution and statutes first would be exceeded and her duty breached.' "

*OEA*, 301 Or at 234 (quoting *State ex rel Fidanque*, 297 Or at 715).

The court's determination in *OEA*—that the Secretary of State's approval of a prospective petition was her *first* action in arguable violation of her powers—confirmed that the plaintiffs, in contesting that action, had not brought their challenge prematurely, as the defendants contended. The defendants' argument—that the plaintiffs should have brought their claim only after enactment of the measure—was unresponsive to the question whether the Secretary of State's responsibility to apply the one-subject rule arose before the election. The plaintiffs' choice to contest the *first* exercise of the Secretary of State's authority over the proposed initiative was correct procedurally, because, as the court stated, that decision was the first of "several discrete decisions" by the Secretary of State in the submission process, "any one of which may be challenged." *Id*.

The individual plaintiffs similarly argue that the Oregon Constitution does not authorize the actions and certifications that the Secretary of State has employed to advance Measure 7 to a vote and to canvass the votes after the election because they contend, among other things, that Measure 7 unlawfully makes multiple amendments to the constitution. The majority responds that *Ellis* declined to consider a similar form-of-adoption challenge to a pre-election certification of an initiative petition. The majority reasons that, because *Ellis* announced a 60-day deadline for challenging the Secretary of State's approval of a proposed initiative, and measured the deadline from certification of the ballot title, the *Ellis* deadline expired in this case in June 1999. Because that theory would restrict significantly the appeal remedy in ORS 246.910(1), I examine *Ellis* in detail.

### *ELLIS v. ROBERTS*

*Ellis* was a challenge under ORS 246.910(1) by registered voters to the Secretary of State's certification on July 16, 1986, of Ballot Measure 11 (1986) for the November 1986, ballot. The plaintiffs commenced their appeal under ORS 246.910(1) on July 31, 1986, and argued that the Secretary of

State's certification was unauthorized because Measure 11 contained more than one subject. Measure 11 purported to create a homestead exemption from property taxes and also prohibited the legislature from referring a sales tax to the people for a vote. The trial court dismissed the action on a theory of laches. *Ellis*, 302 Or at 10-11.

On review, this court determined that the plaintiffs satisfied the requirement in ORS 246.910(1) that they be "adversely affected" because they were registered voters and the statute permitted any registered voter to file an action. *Id.* at 11. The court also determined that the doctrine of laches had no application to an action under ORS 246.910(1). *Id.* at 12. The court distinguished the plaintiffs' statutory action from an earlier case, *Fidanque*, a mandamus proceeding in which laches was a pertinent defense. Neither of those determinations in *Ellis* is in controversy in this case.

The *Ellis* opinion then did an odd thing. The court asked itself the following question: "Should actions like the present one be subject to some kind of 'reasonable time' limitation on filing, in the absence of statutes imposing such restraints?" *Id.* at 13. The court acknowledged what it described as a "legislative vacuum" regarding a time limit on filing appeals under ORS 246.910(1), because the legislature had not enacted a time limit for the filing of an appeal under that statute. Responding to that legislative vacuum, the court asserted that "we are required to provide some judicial framework until the legislature provides a statutory one." *Id.* The court never explained the source of such a requirement. Turning to *Fidanque*, the mandamus case, the court acknowledged that the submission process required the Secretary of State to make a series of decisions, that each decision was susceptible to challenge, and that the *first* exercise of the Secretary of State's authority occurred when she approved the proposed initiative for circulation. *Id.* at 15-16. The court noted that "eleventh hour challenges" might cause initiative proponents to waste their resources in collecting signatures and might force courts to "steamroll through the delicate legal issues to meet the deadline for measures to be placed on the ballot." *Id.* at 16 (quoting *Fidanque*, 297 Or at 718).

Proceeding from the foregoing reasoning, the court announced that a "reasonable" time filing deadline should apply to appeals under ORS 246.910(1). The court continued by announcing that "[t]here is a season for each kind of challenge to the Secretary of State's administration of the election laws * * *." *Id.* at 17. The court then announced that, by looking at the statutory appeal period allowed under the APA, the court could determine that 60 days after approval of the ballot title was a reasonable time period for filing a one-subject challenge under ORS 246.910(1). The court held that, because the Secretary of State had approved the proposed initiative for circulation on August 16, 1985, the "deadline" that the court created had expired nine months before the plaintiffs had filed their action. The court then applied its newly announced deadline retroactively to the plaintiffs' appeal and dismissed it. *Id.* at 19.

Perhaps the most striking aspect of the *Ellis* opinion is that, due to the court's perception that the legislature had failed to append a filing deadline to ORS 246.910, the court believed that it was authorized by something inherent in the court's judicial power—a source of authority that the *Ellis* opinion never made clear—to manufacture a filing deadline for a statutory appeal and to dismiss any appeal that a party had filed after that deadline. That reasoning reflects serious legal error.

For a very long time, Oregon law has condemned any arrogation of the legislature's lawmaking power by a court, including under the guise of statutory interpretation, as action in excess of lawful judicial power. In *State ex rel Everding v. Simon*, 20 Or 365, 26 P 170 (1891), this court addressed the meaning of an 1889 statute that amended an 1885 law that had provided for the election and the term of office of the office of Portland Police Commissioner. The court observed that the 1889 statute had repealed the existing statutory provisions for an election and the term of office. The incumbent police commissioner urged the court to recognize that the 1889 deletions were unintentional and to "fill in" the absent election procedures by interpretation. This court stated:

"This is a case, it would seem, where the legislature has omitted by mistake or otherwise to make the necessary provisions to carry out its intention, but we cannot by construction supply these omissions. As was said by Davies, J., 'It is always competent for the legislature to speak clearly and without equivocation, and it is safer for the judicial department to follow the plain and obvious meaning of an act, rather than to speculate upon what might have been the views of the legislature in the emergency which may have arisen. It is wiser and safer to leave to the legislative department to supply a supposed or actual *casus omissus* than to attempt to do so by judicial construction.' (*People v. Woodruff*, 32 N.Y. 364.) Courts cannot supply omissions in legislation, nor afford relief because they are supposed to exist. To adopt the language of Mr. Justice Woods, in *Hobbs v. McLean*, 117 U.S. 579, 'when a provision is left out of a statute, either by design or mistake of the legislature, the courts have no power to supply it. To do so would be to legislate and not to construe.' "

*Id.* at 373-74.

That passage in *State ex rel Everding* reflects current Oregon law. It is clear that the court in *Ellis* acted beyond the scope of its legitimate judicial authority in fabricating a filing deadline for an appeal under ORS 246.910(1). The *Ellis* court ignored the most fundamental precept of judicial review of a statute: That the responsibility for deciding matters of policy—such as whether a particular filing deadline ("reasonable" or otherwise) shall govern a statutory remedy—rests exclusively with the legislature, not the court. That is, whether there is or should be a "season" for challenges permitted by ORS 246.910(1) is solely a question for the legislature.[2]

---

[2] Relying on *Ellis*, the court has announced a different deadline of five days for filing a challenge under ORS 246.910 regarding a fiscal impact statement. *State ex rel Bunn v. Roberts*, 302 Or 72, 82, 726 P2d 925 (1986). Also relying on *Ellis*, the court has held that a petitioner may file a timely challenge under ORS 246.910 by appealing within 60 days the Secretary of State's certification of an initiative petition for the ballot. *Crumpton v. Roberts*, 310 Or 381, 390, 798 P2d 1100 (1990). As in *Ellis*, neither of those decisions purports to find a basis for those deadlines in the intention of the legislature. *Crumpton* also contradicts the court's conclusion here that a petitioner may challenge only the Secretary of State's first exercise of authority over an initiative petition, but the majority does not explain away that contradiction.

It might be possible to distinguish *Ellis* from the present appeal, which challenges in part conduct by the Secretary of State that occurred *after* the election. *Ellis* stated that it was placing a timeline requirement "on pre-election challenges of this kind," and, as a consequence, the court declined to address whether "a post election challenge of the kind that occurred in *Anthony v. Veatch*, 189 Or 462, 220 P2d 493[,] *reh den*[,] 221 P2d 575 (1950), still would be possible. *But see State ex rel Fidanque v. Paulus, supra*, 297 Or at 719." *Ellis*, 302 Or at 19 n 5. The passage of *Fidanque* that *Ellis* cited purported to justify the application of laches in *Fidanque* in part on "the potential availability of post-election challenge under [Oregon Constitution] Article IV, section 20, should Ballot Measure 8 ultimately be approved * * *." *Fidanque*, 297 Or at 719.

The majority, however, has chosen to answer the question that *Ellis* did not decide and has extended the *Ellis* deadline to apply to challenges under ORS 246.910(1) to official acts occurring both before *and after* an election. The question, therefore, is whether the court should treat *Ellis* as a case law precedent and extend the *Ellis* deadline to challenges to post-election official actions.

In determining whether this court should adhere to *Ellis* as a precedent, we must look to the standards that this court has established for determining whether a particular case deserves that status. Some of this court's decisions have repeated what has come to be known as the rule of "prior interpretation." For example, in *State v. King*, 316 Or 437, 445-46, 852 P2d 190 (1993), this court stated:

"When this court interprets a statute, the interpretation becomes a part of the statute, subject only to a revision by the legislature. Having once construed the same provisions of this statute, albeit in a slightly different context, to have a particular meaning, we will not now consider a contrary interpretation." (Citations omitted.)

I have discussed elsewhere my concern that that statement does not reflect Oregon law and is an unnecessarily rigid deviation from the correct rule that governs this court's adherence to case law precedent: The rule of *stare*

*decisis. State ex rel Huddleston v. Sawyer*, 324 Or 597, 638-44, 932 P2d 1145 (1997) (Durham, J., concurring in part and dissenting in part). However, even the purported rule of prior interpretation applies only when an earlier case has *interpreted the statute* that the court is reviewing. *Ellis* did not purport to interpret ORS 246.910 or any other statute in creating the 60-day filing deadline.[3] The court fabricated the 60-day deadline because the legislature supposedly had failed to establish any time limit for filing appeals under ORS 246.910.[4] In that context, the so-called rule of "prior interpretation" is inapplicable, because *no prior interpretation of a statute exists*.

Neither is the *Ellis* deadline entitled to deference under the principle of *stare decisis*. The court's unilateral announcement of a time limit on a statutory appeal, and the absence of support for the deadline in the text of ORS 246.910 or any other contextual statute, undermine the legitimacy of *Ellis* as a precedent. If, indeed, the legislature chose, as the *Ellis* court asserted, to impose no deadline on the opportunity of registered voters under ORS 246.910 to challenge official acts or failures to act under election laws, that policy choice deserves respect and deference by this court, not a judicial veto.

Other aspects of the *Ellis* court's rationale indicate that the act of manufacturing a deadline was not a valid

---

[3] The *Ellis* court did refer to one arguably analogous deadline statute, ORS 183.484(2), which governs the appeal of an "order in other than a contested case." The court failed to acknowledge that that purported analogy breaks down under analysis, because ORS 246.910(1) applies more broadly to any act or failure to act, not only to orders, and, under the court's previous case law reviewed above, any of the Secretary of State's various actions and decisions, once made, becomes subject to review under ORS 246.910(1).

[4] The *Ellis* court's assertion that a "legislative vacuum" existed regarding filing deadlines might have been false, because the court failed to determine the applicability of other potentially relevant statutory deadlines. Those include ORS 12.080, which concerns actions on a liability created by statute, and ORS 30.275, which concerns actions against a public body based on "tort," which ORS 30.260(8) defines in part to include "the breach of a legal duty that is imposed by law," that "results in injury to a specific person or persons for which the law provides a civil right of action * * * for a protective remedy." The court must determine the applicability of those or any other relevant period of limitations before it can assert accurately that the legislature failed to limit the time for filing an appeal under ORS 246.910. Neither of the potentially applicable deadlines cited above would bar the individual plaintiffs' appeals in this case.

exercise of judicial power and that that act does not merit deference under the doctrine of *stare decisis*. For example, the *Ellis* court's announced concern for the resources of petition circulators is beside the point. The court must assume instead that the legislature took that concern into account in enacting ORS 246.910(1). It is obvious that the legislature was even more concerned that Oregon registered voters should have a prompt and effective method of challenging *every* unauthorized official act or failure to act under Oregon election laws whenever such a default might occur.

The *Ellis* court's concern regarding the deleterious effect of "eleventh-hour" appeals on the court's ability to analyze sensitive questions before an approaching election similarly is unfounded. Nothing in ORS 246.910 requires any court to decide an appeal under that statute before an election or any other election-related event. ORS 246.910(3) authorizes "the circuit courts and Court of Appeals, in their discretion," to "give such precedence on their dockets to appeals under this section as the circumstances may require." I agree that that subsection anticipates prompt judicial consideration and determination of appeals under ORS 246.910(1). However, the *Ellis* court's notion that the courts are under pressure to decide appeals under ORS 246.910(1) *before elections* goes well beyond anything that the statute implies. And, pressure of that sort applied by the parties to an appeal, although understandable in the context of pre-election appellate advocacy, in no way justifies the judicial adoption of a nonstatutory deadline to defeat all but the earliest challenges to assertedly unauthorized official conduct.

The purported pressure of an impending election is absent, in any event, in this case, because plaintiffs filed their appeal after the election. The *Ellis* court's concern that "eleventh-hour" appeals might place pressure on the courts to decide important legal questions in haste is irrelevant when, as here, the appeal asserts that the Secretary of State's allegedly unauthorized conduct occurred or continued *after* the election.

Finally, *Ellis* failed to analyze this court's previous determinations in other cases discussed above that, under

Secretary of State's official power is subject to review under ORS 246.910. Those earlier statements from this court give full effect to the wording of ORS 246.910 that "any act or failure to act" is subject to appeal. *Ellis* failed to analyze either those previous statements from this court or the inconsistency between the court's deadline and the statute's promise that *any* act or failure to act by the Secretary of State under an election law is subject to appeal.

The rule of *stare decisis* does not require the court to adhere to the *Ellis* deadline as a case law precedent. The foregoing concerns about the legal efficacy of the *Ellis* deadline and the court's expressed reasoning in support of that deadline lead me to conclude that the court should reconsider *Ellis*, not broaden its application to govern *all* appeals under ORS 246.910.

My review of the text of ORS 246.910, including the statutory context and pertinent case law, indicates that each of the Secretary of State's multiple actions in the initiative process is subject to an appeal as it occurs, not only the first act. The trial court did not err in asserting jurisdiction over the challenges of the individual plaintiffs to the Secretary of State's actions regarding Measure 7. I would affirm the trial court's action in that regard.

## CONCLUSION

By extending the deadline created by the court in *Ellis* to apply to all appeals filed under ORS 246.910(1), the majority has undermined the appeal remedy provided in that statute. No longer may a registered voter bring a judicial challenge under that statute to *any* act or failure to act by the Secretary of State that allegedly exceeds his authority. Instead, the majority has twisted the legislature's scheme to confine such challenges solely to the Secretary of State's *first* purported exercise of authority.[5] As this case illustrates, that

---

[5] The majority in a footnote attempts to refute that reading of its opinion, and asserts that the voters still have the opportunity to file timely challenges to other, presumably later, acts by the Secretary of State under ORS 246.910. 334 Or at 657 n 13. However, the majority cannot square that statement with its dismissal of the complaints of the individual plaintiffs here. Those complaints allege in part that the Secretary of State committed an unauthorized act—canvassing the votes regarding Measure 7—*less than 30 days* before the individual plaintiffs filed their complaints. The majority's explanation for why the individual plaintiffs'

window of opportunity to file a challenge can expire many months or years before the Secretary of State places the proposed measure on the ballot, counts the votes, or certifies the measure's passage or defeat in an election. Once the court-made deadline expires, no registered voter or other adversely affected citizen may use ORS 246.910(1) to challenge a Secretary of State's later exercises of authority to advance a proposed measure to the ballot, despite a total absence of legal authority to do so and regardless of the public costs at stake.

The election law responsibilities of the Secretary of State and other election officials are not simple. Constitutional requirements for lawmaking by initiative require careful observance at all stages of the initiative process, not only at the earliest. The legislature designed the appeal remedy in ORS 246.910(1) to permit an adversely affected citizen to protest in court whenever *any* act or failure to act by an election official falls short of legal requirements under election laws. The majority's result defeats, rather than respects, the legislature's remedial scheme. Although I concur in the majority's disposition of the other claims under ORS 28.020, I dissent from the majority's dismissal of the individual plaintiffs' claims under ORS 246.910(1).

For the foregoing reasons, I concur in part and dissent in part from the majority's decision.

---

complaints about *that* unauthorized act are not filed timely will have to wait, unfortunately, for another case.