Argued and submitted February 25; resubmitted en banc August 7, affirmed
October 30, 2002

CITY OF NYSSA,
*Respondent,*

*v.*

Sally A. DUFLOTH,
*Appellant.*

A00080112; A113180 (Control)

CITY OF NYSSA,
*Respondent,*

*v.*

Duane L. SMITH,
*Appellant.*

A00080111; A113181
(Cases Consolidated)

57 P3d 161

Laura Graser argued the cause and filed the briefs for appellants.

James N. Westwood argued the cause for respondent. With him on the brief were Scott E. Crawford, Stoel Rives LLP, Gary Kiyuna and Stunz, Fonda, Kiyuna & Horton.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, Brewer, and Schuman, Judges.

KISTLER, J.

Edmonds, J., concurring.

Armstrong, J., dissenting.

Schuman, J., dissenting.

**KISTLER, J.**

The City of Nyssa enacted an ordinance that requires nude dancers to remain at least four feet away from the audience. The municipal court convicted defendants of violating that ordinance, and the circuit court upheld the convictions. On appeal, defendants argue that the city's ordinance violates Article I, section 8, of the Oregon Constitution. We affirm.

Defendants operate Miss Sally's Gentlemen's Club in the City of Nyssa. On February 27, 2000, the city cited defendants for "allowing dancing within 4 ft" of the audience in violation of the Nyssa City Code (NCC). Subsection 5.10.130(17) of that code provides:

> "No entertainer is permitted to be unclothed or in less than opaque and complete attire, costume or clothing, so as to expose to view any portion of the pubic region, buttocks, genitals, vulva, or anus, except removed at least four feet (4') from the nearest patron."[1]

The municipal court found that defendants had allowed the audience to come within four feet of the dancers in violation of the city's ordinance and fined each defendant $185. On appeal to the circuit court, defendants demurred to the indictment. *See* ORS 221.359. The circuit court overruled the demurrer and found defendants guilty of violating the ordinance.

■ On appeal, defendants assign error to the circuit court's ruling denying their demurrer. *See* ORS 221.360. They argue that the city's ordinance, which they characterize as a restriction on nude dancing, impermissibly regulates expression in violation of Article I, section 8.[2] The city

---

[1] The citation refers to NCC § 5.10.050, which provides that the stage "shall be separated by a distance of at least four feet from all areas of the premises to which members of the public have access." Both parties, however, have briefed the case on the premise that NCC § 5.10.130(17) is the operative provision. We accept that premise for the purpose of analyzing defendants' constitutional challenge.

[2] Defendants also argue that the trial court erred in not permitting them to introduce evidence in support of their demurrer. A demurrer, however, is limited to the face of the charging instrument. *See State v. Weber*, 172 Or App 704, 713, 19 P3d 378 (2001).

responds that, not only has the Oregon Supreme Court not held that nude dancing is protected expression under Article I, section 8, but that our reasoning in *State v. Ciancanelli*, 181 Or App 1, 45 P3d 451, *rev allowed*, 335 Or 90 (2002), compels the conclusion that nude dancing is not protected expression, at least under the state constitution.[3] The city argues alternatively that, even if nude dancing is protected expression, the city's ordinance is not an impermissible restraint on expression. In the city's view, a dancer remains free to express him- or herself however he or she wishes. The only restriction the city's ordinance imposes is on the audience; it must stay a reasonable distance away from the dancers.

The concurring and dissenting opinions divide over the question whether a time, place, and manner regulation imposed on a particular kind of expression is a law directed at an effect or one directed at expression. The concurring opinion reasons that the ordinance satisfies Article I, section 8, because it "focus[es] on the effects or harms that could occur because of the close proximity of patrons to nude dancers and the potential of sexual contact between them." 184 Or App at 639 (Edmonds, J., concurring). One of the dissenting opinions reasons that the ordinance regulates a type of expression, nude dancing, in order to prohibit an effect, sexual contact between the dancers and the patrons, and that the failure to prohibit the effect itself makes the ordinance facially unconstitutional. 184 Or App at 657-58 (Schuman, J., dissenting). The other dissenting opinion would hold that the ordinance suffers from an additional defect. 184 Or App at 653 (Armstrong, J., dissenting). In its view, the ordinance regulates performers "who use nudity in their expressive work" differently from other performers and thus runs afoul of Article I, section 8. *Id.*; *see also League of Oregon Cities v. State of Oregon*, 334 Or 645, 56 P3d 892 (2002).

■    In *City of Portland v. Tidyman*, 306 Or 174, 184, 186, 759 P2d 242 (1988), the court held that a similar time, place, and manner regulation—an ordinance that zoned adult businesses to prevent urban blight—was "flatly directed against

---

[3] We issued our decision in *Ciancanelli* after oral argument in this case. The city filed a memorandum of additional authorities asserting that *Ciancanelli* controls this case. Defendants have not responded to the city's memorandum.

one disfavored type of pictorial or verbal communication" and thus facially unconstitutional under Article I, section 8.[4] We need not decide the issue that divides the concurrence and the dissents—whether the time, place, and manner regulation at issue here is aimed at an effect or, like the ordinance at issue in *Tidyman*, "is flatly directed against one disfavored type [of expression]." *See id.* Even if the ordinance is directed at expression, under *Ciancanelli*, nude dancing comes within a well-established historical exception to Article I, section 8, and is thus not protected expression for the purposes of the state constitution.

■     In *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982), the court held that Article I, section 8, of the Oregon Constitution

"forecloses the enactment of any law written in terms directed to the substance of any 'opinion' or any 'subject' of communication, unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach. Examples are perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants."

As the court explained, Article I, section 8, contains both a broad prohibition and an exception. As a general rule, Article I, section 8, prohibits the enactment of any law that is written in terms directed at speech rather than effects.[5] *Id.* That principle requires the legislature to specify the effects it intends to prohibit instead of using speech as a proxy for those effects. *Tidyman*, 306 Or at 185-86.[6] The prohibition is

---

[4] The zoning ordinance at issue in *Tidyman* was a classic time, place, and manner regulation. It did not prohibit adult businesses as such. Rather, it controlled their location in order to achieve an effect—preventing urban blight. *Tidyman*, 306 Or at 184-85. The ordinance at issue here similarly requires that dancers be separated from the audience in order to achieve an effect—preventing sexual contact between the dancers and the patrons.

[5] We use the terms "speech" and "effects" as shorthand formulations of the more specific test that the court announced in *Robertson*.

[6] In *State v. Stoneman*, 323 Or 536, 545-49, 920 P2d 535 (1996), the court qualified its reasoning in *Tidyman* and *Robertson*. It explained that some laws written in terms directed at expression may still be permissible effects-based statutes. *Stoneman*, 323 Or at 545-49.

not absolute, however, as the court was quick to recognize in *Robertson*. If a law was historically well established and one that the guarantee of free expression was demonstrably not intended to reach, then that law and its contemporary variants survive the adoption of Article I, section 8, even though they expressly prohibit expression.

■     The *Robertson* court did not identify the analytical basis for the historical exception it announced. It noted, however, numerous examples of laws that were directed at the content of speech and that existed before the Oregon Constitution was adopted. It apparently declined to assume that, in prohibiting the legislature from enacting laws directed at speech, the framers of Oregon's Constitution intended to render those well-established laws unconstitutional. *See Tenney v. Brandhove*, 341 US 367, 376, 71 S Ct 783, 95 L Ed 1019 (1951) (applying a similar analysis in a different context). It follows that, in asking whether a law comes within a well-established historical exception within the meaning of *Robertson*, the proper focus is on the intent of the framers measured by the test that the court articulated in *Robertson*. *See Ciancanelli*, 181 Or App at 21, 26.

In this case, we need not undertake that historical inquiry because we have already done so in *Ciancanelli*. In *Ciancanelli*, we considered whether a statute that prohibits persons from presenting "a live public show in which the participants engage in * * * sexual conduct" violates Article I, section 8. 181 Or App at 5. Because that statute was directed at "live public show[s]," we assumed that it was written in terms directed at expression. *Id.* at 7. We held, however, that the statute did not violate Article I, section 8, because it was wholly contained within a well-established historical exception. *Id.* at 19. In reaching that conclusion, we explained that "eighteenth- and nineteenth-century statutes and case law reflect the widespread—if not universal—regulation of public exposure of the genitals." *Id.* at 16. We reasoned that, if the framers had understood that laws regulating public nudity would survive the adoption of Article I, section 8, it necessarily followed that laws regulating public sexual conduct would survive as well. *Id.*

■     Our reasoning in *Ciancanelli* establishes that prohibitions against both public nudity and public sexual conduct come within a well-established historical exception. We relied on the clearly established prohibition against the former to conclude that laws regulating the latter also qualify as a historical exception to Article I, section 8. Under *Ciancanelli*, the City of Nyssa's ordinance regulating nude dancing does not violate Article I, section 8.[7]

We note that we reached a different conclusion in *Sekne v. City of Portland*, 81 Or App 630, 726 P2d 959 (1986), *rev den*, 302 Or 615 (1987). In that case, we held that nude dancing is protected expression under Article I, section 8. We did not decide, however, in *Sekne* whether laws regulating nude dancing come within a historical exception to Article I, section 8. *See id.* at 637. Rather, relying in part on First Amendment cases, we reasoned that nude dancing is protected under the state as well as the federal constitution. *Id.* at 637-38. Not only does our reliance on federal authority undercut the force of our state constitutional analysis in *Sekne, see Nelson v. Lane County*, 304 Or 97, 102, 743 P2d 692 (1987) (plurality), but our holding in *Sekne* cannot be reconciled with our later en banc holding in *Ciancanelli*. We accordingly make explicit what was implicit in *Ciancanelli*: After *Ciancanelli*, our decision in *Sekne* is no longer good law.

---

[7] Neither dissent disputes that our opinion in *Ciancanelli* controls the resolution of this case. Similarly, neither dissent suggests that the majority's discussion of the relevant history in *Ciancanelli* is itself historically inaccurate or incorrect. Rather, one dissent reasons that, if our opinion in *Ciancanelli* is correct, then plays such as *Hair* and *Oh! Calcutta!* will not be entitled to protection under Article I, section 8, of the Oregon Constitution. 184 Or App at 654 (Armstrong, J., dissenting). The persons, however, associated with those plays could still seek protection under the First Amendment, and it does not necessarily follow that the state constitution must be as broad as the federal. That dissent also reasons that it "makes no sense" to say that the Oregon Constitution does not protect live sex acts and nudity in public places but that it does protect the reproduction of those acts in film, photographs, and similar media as the court held in *State v. Henry*, 302 Or 510, 732 P2d 9 (1987). 184 Or App at 654 (Armstrong, J., dissenting). We explained, however, in *Ciancanelli* that the historical exception at issue in *Henry* differs from the one at issue here. 181 Or App at 23. Moreover, the Supreme Court has recognized a historically based exception to Oregon's free speech guarantee, and resort to history does not always produce completely consistent results. The other dissenting opinion questions whether the laws that we discussed in *Ciancanelli* applied to limited-admission nude shows. *See* 184 Or App at 655-56 (Schuman, J., dissenting). We addressed that issue, however, in *Ciancanelli, see* 181 Or App at 19-20, and we adhere to our earlier analysis.

Following *Ciancanelli*, we hold that, because laws regulating nude dancing come within a well-established historical exception, Article I, section 8, does not prohibit their enactment. More specifically, Article I, section 8, does not prohibit the City of Nyssa from requiring that the audience stay at least four feet away from defendants' nude dancers. Nude dancing is, of course, entitled to all the protection that the First Amendment affords, but defendants have not raised a First Amendment claim in this case. The trial court correctly denied defendants' demurrer.

Affirmed.

**EDMONDS, J.,** concurring.

The majority holds that Nyssa City Ordinance 578 does not constitute an impermissible restraint on protected expression because the conduct it regulates—nude dancing—is contained wholly within a well-established historical exception to Article I, section 8, of the Oregon Constitution, and thus does not constitute protected expression for the purposes of the state constitution. I agree with the majority's conclusion that the ordinance does not violate Article I, section 8, but for a different reason: Ordinance 578 is not directed at the substance of any opinion or the subject of any communication. Therefore, it does not implicate section 8. Alternatively, it should be held to focus on the effects or harms that could occur because of the close proximity of patrons to nude dancers and the potential of sexual contact between them, and therefore, even though it burdens freedom of expression, it is a permissible regulation for purposes of public health, safety and welfare.

Article I, section 8, provides, "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of that right." In *State v. Robertson*, the court said that Article I, section 8, "forecloses the enactment of any law *written in terms directed to the substance of* any opinion or any subject of communication." 293 Or 402, 412, 649 P2d 569 (1982) (emphasis added).[1] In *State v. Stoneman*, 323 Or 536, 543-44, 920 P2d

---

[1] An effects-oriented law is permissible in the sense that it is "not a law whose enactment was for this reason alone wholly withdrawn from legislative authority

535 (1996), regarding the resolution of a free speech issue under Article I, section 8, the Supreme Court said,

> "We begin th[e] exercise by deciding whether [the disputed provision] was on its face 'written in terms directed to the substance of any "opinion" or any "subject" of communication.' *Robertson,* 293 Or 412 * * *
>
> "* * * * *
>
> "[T]he universe of statutes may be divided initially into two categories—those that focus on the content of speech and those that focus on the effect of speech."

The majority's first error is its failure to follow the analytical template articulated in *Stoneman.* The majority apparently assumes that Ordinance 578 is directed at the content of protected expression and, accordingly, leaps immediately into the historical exception analysis that follows from that conclusion. Instead, we must begin by inquiring whether the ordinance is directed at the substance of any opinion or the subject of any communication. That query begins with the text of the ordinance. NCC § 5.10.130(17), the challenged portion of the ordinance, provides,

> "No entertainer is permitted to be unclothed or in less than opaque and complete attire, costume or clothing, so as to expose to view any portion of the pubic region, buttocks, genitals, vulva, or anus, except removed at least four feet (4') from the nearest patron."

Facially, the terms of the above subsection are not "directed to the substance of any opinion," or the "subject of communication." The ordinance prohibits neither nude dancing nor the communication of an erotic message through the medium of dance. At most, the ordinance deprives the patron of a more intense erotic experience by imposing barriers of space or other mediums between the patrons and the performers. On the record before us, there is nothing that suggests that the content of the dancer's communication is inhibited in any manner by the four-foot spatial barrier required by the ordinance. Moreover, as will be discussed later in this

---

by [A]rticle I, section 8." *Robertson*, 293 Or at 415. However, when a statute necessarily implicates speech in the definition of the offense, "the statute is susceptible to attack for possible overbreadth." *Id.*

opinion, the barriers required by the ordinance are aimed at preventing unlawful sexual contact, enhancing dancer and patron safety in the same manner that barriers in theaters or public auditoriums promote public safety.[2]

Other courts that have considered similar restrictions on the proximity of nude dance performers to patrons agree that distance and barrier restrictions are not restraints on expression. *See, e.g., Barnes v. Glen Theatre, Inc.*, 501 US 560, 571, 111 S Ct 2456, 115 L Ed 2d 504 (1991); *BSA, Inc. v. King County*, 804 F2d 1104, 111 (9th Cir 1986) (18-inch stage and six-foot distance requirement upheld as not violative of freedom of expression); *DFW Vending, Inc. v. Jefferson County, Tex.*, 991 F Supp 578 (E D Tex 1998); *Colacurcio v. City of Kent*, 944 F Supp 1470 (W D Wash 1996), *aff'd*, 163 F3d 545 (9th Cir 1998), *cert den*, 529 US 1053 (2000) (nothing under the First Amendment prohibits a 10-foot buffer zone between dancers and customers and there is no constitutional right to the maximum erotic experience possible); *City of Colorado Springs v. 2354 Inc.*, 896 P2d 272, 297-98 (Colo 1995) (three-foot buffer zone upheld); *Ino Ino, Inc. v. City of Bellevue*, 132 Wash 2d 103, 937 P2d 154, *opinion amended*, 943 P2d 1358 (1997), *cert den*, 522 US 1077 (1998) (four-foot buffer zone upheld); *DCR, Inc. v. Pierce County*, 92 Wash App 660, 964 P2d 380 (1998), *rev den*, 137 Wash 2d 1030 (1999), *cert den*, 529 US 1053 (2000) (the proximity component of dancing is mere conduct that is not constitutionally protected; 10-foot buffer zone is not directed at the expressive element of speech). Although the above cases do not interpret Article I, section 8, specifically, their reasoning informs our decision on whether section 8 is implicated by the reach of the ordinance.

A comparison of the space restriction in Ordinance 578 with the ordinance at issue in *Sekne v. City of Portland*, 81 Or App 630, 726 P2d 959 (1986), *rev den*, 302 Or 615 (1987)[3] is also instructive. The ordinance in *Sekne* prohibited,

---

[2] *See, e.g., City of Portland v. Ayers*, 93 Or App 731, 735, 764 P2d 556 (1988), *rev den*, 308 Or 79 (1989) (holding that an ordinance prohibiting the operation of a sound-reproducing device on the public right-of-way that was audible 50 feet or more from the device "obviously does not prohibit speech").

[3] The majority holds that the reasoning in *State v. Ciancanelli*, 181 Or App 1, 45 P3d 451, *rev allowed*, 335 Or 90 (2002) compels the conclusion that *Sekne's*

in part, stage or floor show entertainers from exposing genitalia or breasts to public view during a performance. We began our analysis in that case by observing that under some circumstances, nude conduct could constitute "expression" within the meaning of Article I, section 8. We cited *City of Portland v. Gatewood*, 76 Or App 74, 708 P2d 615 (1985), *rev den*, 300 Or 477 (1986), for that conclusion. Moreover, we reasoned that dance is protected by Article I, section 8, and held that "[n]udity alone does not take dance out of the realm of protected expression." *Sekne*, 81 Or App at 637. Here, Ordinance 578 *permits* what the ordinance in *Sekne* prohibited insofar as nude dancing is concerned. Ordinance 578 does not prohibit a performer from dancing erotically for a patron; rather, it merely imposes the requirement of a spatial barrier between the performer and the patron. The contrast between the ordinance in *Sekne* and Ordinance 578 illustrates that the latter is not directed at the substance of any opinion or the subject of any communication and thus, does not implicate Article I, section 8.

It could be argued that the ordinance violates Article I, section 8's prohibition because it focuses on only one disfavored type of entertainment rather then all kinds of entertainment where public health concerns for performers and patrons also exist. *See City of Eugene v. Miller*, 318 Or 480, 491, 871 P2d 454 (1994) (holding that the state or a local government may not treat those who sell expressive material "more restrictively" than those who sell other forms of merchandise). Although an ordinance may not be "directed in

---

ruling that some forms of nude dancing are constitutionally protected expression must be overruled. *Ciancanelli* involved nude performers who performed acts of public masturbation and public sexual intercourse in violation of ORS 167.062. We said, "[E]ven assuming that the statute restrains expression, we conclude that the restraint does not run afoul of Article I, section 8." 181 Or App at 7. We then went on to determine that the conduct at issue fell within a historical exception to Article I, section 8. Whether nude dancing is the kind of conduct that also falls within a historical exception to section 8 was not an issue that was presented or argued in *Ciancanelli*. Article I, section 8, is not a self-announcing rule of law, as demonstrated by the diverse interpretations of the Oregon Supreme Court on the subject. Its interpretation is dependent on the individual facts and law of each case. The implication of the historical information in *Ciancanelli* regarding the continuing validity of *Sekne* and whether nude dancing was considered by the framers to constitute a historical exception to section 8 is not an issue we should decide in this case because it is unnecessary to our decision.

terms against any subject of expression," it may still impermissibly burden the right of free speech as applied if it reaches privileged communications. That is, apparently, the concern of Judge Armstrong in his dissent.

Judge Armstrong writes,

"A restriction on the manner in which expression can occur based on the content of the expression is a restriction on expression. It does not become something other than a restriction on expression simply because some expression can occur notwithstanding the restriction."

184 Or App at 653 (Armstrong, J., dissenting) (footnote omitted). That reasoning proves too much. A "restriction" or "to restrict" in the context of section 8's prohibition against laws restricting the freedom of expression means "to check, bound or decrease the range, scope, or incidence of." *Webster's Third New Int'l Dictionary* 1937 (unabridged ed 1993). There is no persuasive assertion in this case that a four-foot separation between performers and patrons will somehow, in the ordinary understanding of the word "restrict," decrease or limit the erotic message of the performance. The message of the performance remains the same, whether viewed with, or without the barrier.

Moreover, Judge Armstrong's reasoning belies a commonsense understanding of section 8's guarantee against *impermissible* burdens on free speech. A local government may enact reasonable regulations in furtherance of its legitimate interest in promoting public health, safety and welfare. *City of Astoria v. Nothwang,* 221 Or 452, 460, 351 P2d 688 (1960). Even assuming that the requirements of the ordinance constitute a burden on expression, they are reasonable. If the four-foot spatial barrier makes it more difficult for a patron to view a performance, the public health, safety, and welfare concerns underlying the requirement render it a permissible burden on the freedom of expression, so long as it appears from the regulation that the nature of the expression reasonably requires regulation in a manner differently and more stringently than other forms of expression because of "special need" or "special problems." *Miller,* 318 Or at 491.

Assuming that NCC § 5.10.130(17) has the appearance of a proscription against certain subjects of expressive material, the remainder of Ordinance 578 provides context and demonstrates that the section at issue is directed at the harmful effects of sexual contact between performers and customers. Laws that focus on forbidden effects, but expressly prohibit the expression used to achieve those effects are analyzed for overbreadth. *State v. Plowman*, 314 Or 157, 164, 838 P2d 558 (1992), *cert den*, 508 US 974 (1993). In its analysis of the effects-based statute before it, the *Stoneman* court explained,

> "It is true that, when viewed in isolation, [the statute at issue] appears to have contained a content-based proscription on expressive material. * * *[4] But a statute cannot be read in a vacuum. *An examination of the context of the statute, as well as of its wording, is necessary to an understanding of the policy that the legislative choice embodies.* * * * A closer look at the provision under examination here, within its statutory context, reveals a different focus."

323 Or at 545-46 (emphasis added). After examining the wording and the historical context of the statute before it, the court concluded that it prohibited only expression that necessarily involved the actual participation of minor children in sexual acts. Consequently, the court concluded that the statute focused on harmful effects rather than on expression.

In light of the context of Ordinance 578, NCC § 5.10.130(17) is merely directed at prohibiting sexual contact between patrons and performers, thus providing for the safety and protection of both. The prefatory provisions of the ordinance provide, in relevant part,

> "WHEREAS, the Common Council of the City of Nyssa, Oregon, is committed to protecting the public safety, health and general welfare of the City through the enforcement of laws prohibiting indecency and sexual offenses, while preserving the constitutionally protected forms of expression,

---

[4] *Former* ORS 163.680 (1987), *repealed by* Or Laws 1995, ch 768, § 16, made it unlawful for any person to pay or give anything of value to observe explicitly sexual conduct by a child known by the person to be under 18 years of age or pay or give value to obtain a photograph, motion picture, videotape, or other visual reproduction of sexually explicit conduct by a child under 18 years of age.

and based upon the public testimony and other evidence and information presented to it, the City Council finds that:

"A. Regulation of adult businesses performing live adult entertainment is necessary because in the absence of such regulation, significant criminal activity has historically and regularly occurred;

"B. Important and compelling governmental interests provide a constitutional basis for regulation of sexual conduct and for the regulation of the time, place and manner under which live adult entertainment occurs;

"C. The *regulation of distances* at which live performances occur from the patrons, the *establishment of unobstructed views* of such performances at all times and places with minimum levels of illumination, and restrictions on the *direct exchange of cash or items* between performer and patron, are each directed at the elimination of sexual conduct or other adverse secondary effects, unrelated to the protected expression of the performer;

"D. The provisions of this ordinance shall not be construed as permitting any use, activity or structure that is otherwise prohibited, nor shall it be construed so as to prohibit conduct or expression that are subject to constitutional protection[.]"

(Emphasis added.) The above provisions, when read together with the ordinance's definitional section and the requirements in the remainder of the ordinance, both clearly identify the specific harms that the ordinance is intended to remedy and addresses those harms.

That understanding leads me to consider the significance of the Supreme Court's holding in *City of Portland v. Tidyman*, 306 Or 174, 759 P2d 242 (1988), to this case. In *Tidyman*, the city enacted an ordinance that required adult bookstores to locate at least 500 feet from any residential zone or any private or public school and at least 1,000 feet from other "adult business" in some zones. *Id.* at 178. The prefatory provisions of the ordinance recited the history of the city's prior regulation of sexually oriented business. Those provisions stated that the city had earlier found adult bookstores and theaters inherently incompatible with residential zones "because these businesses adversely affect the

quality and stability of nearby residential areas." *Id.* at 184. The ordinance concluded that the clustering of adult business "tended to create or accelerate blighted conditions." *Id.*

The city argued that the ordinance focused on the effects of speech. Relying on the assertions made in the prefatory provisions of the ordinance, it asserted that the ordinance undertook to prevent what the city believed was the effect on neighborhoods and communities of commerce involving sexually explicit verbal or pictorial material. However, the court disagreed, saying that the findings in the ordinance "are vague and conclusory. They leave unexplained what is meant by the 'quality and stability of nearby residential and commercial areas,' by 'blighted conditions,' and by 'conflicts resulting from close proximity to adult businesses[.]' " *Tidyman*, 306 Or at 185. The court explained,

> "In short, the problem with the city's asserted 'concern with the effect of speech,' is that the operative text of the ordinance does not specify adverse effects that constitute the 'nuisance' attributable to the sale of 'adult' materials and therefore does not apply only when these adverse effects are shown to occur or imminently threaten to occur. Rather, the ordinance makes a one-time legislative determination that retailing substantial quantities of sexually oriented pictures and words within the proscribed area will have adverse effects that retailing other pictures and words would not have, and that it therefore can be restricted as a 'nuisance' by a law describing the materials rather than the effects. By omitting the supposed adverse effects as an element in the regulatory standard, the ordinance appears to consider the 'nuisance' to be the characteristic of the 'adult' materials rather than secondary characteristics and anticipated effects of the store. Such lawmaking is what Article I, section 8, forbids."

*Id.* at 185-86 (footnote omitted). Thus, under *Tidyman*,

> "a regulation ostensibly directed against expression might pass constitutional muster, provided that such a regulation in fact was directed toward negative effects sought to be prevented and also specified the harm that otherwise would arise if the regulation were not adopted."

*League of Oregon Cities v. State of Oregon*, 334 Or 645, 56 P3d 892 (2002).

*Tidyman*'s holding is inapposite to the issue in this case. The regulation in *Tidyman* was aimed at the subject of communication, *i.e.*, the prevention of the sale or distribution of expressive adult material in certain geographical areas. It could have passed constitutional muster under Article I, section 8, only if it fell within the second *Robertson* category, *i.e.*, laws that focus on forbidden effects, but expressly prohibit the expression used to achieve those effects. As I have stated previously, the four-foot spatial barrier at issue here is not a regulation that prohibits expression. Rather, in contrast to the ordinance in *Tidyman* that prohibited the dissemination of expressive materials, the city of Nyssa's ordinance allows nude dancing to occur.

Even if the city's ordinance is deemed to be a law that prohibits certain expression to prevent harmful effects, the language of the ordinance, unlike that in *Tidyman*, clearly identifies the harm to be prevented. The provisions of Ordinance 578 identify the prevention of public sexual contact between performers and patrons as the government interest carried out by the restrictions the law imposes. The harmful effects to public health engendered by public sexual contact for purposes of paid entertainment are evident from the terms of the ordinance itself. It takes no stretch of the imagination, given the recitals in the ordinance and the erotic nature of the dancing at issue, to perceive that, in the absence of a barrier between performers and patrons, the threat of such harmful activities as "lap dancing," the touching of each other's sexual body parts by performers and patrons, and the resulting exchange of money for such sexual contact would be imminent and likely to occur.[5] The city need not wait until such harm actually occurs to regulate it. Unlike the ordinance in *Tidyman*, which presumed harm from adult bookstores without demonstrating any adverse effects, the harm from sexual contact between performers

---

[5] One need only to read the facts described in *Ciancanelli*, 181 Or App at 3-4, to arrive at such a conclusion. The court noted in *Tidyman* that a city need not wait until substantial harm occurs to impose restrictions. The city must merely show "the reality of the threatening effect at the place and time" specified in the ordinance. 306 Or at 188. Due to the imminence of the harm described throughout the provisions of the ordinance, that requirement is met in this case.

and patrons to public health that the City of Nyssa's ordinance seeks to prevent is clear from the text and the context of the ordinance itself.

That view is supported by our holding in *State v. Maynard*, 168 Or App 118, 5 P3d 1142 (2000), *rev den*, 332 Or 137 (2001). In *Maynard*, we held that ORS 165.065(1)(a), the statute at issue in the case, addressed harmful effects that the legislature could constitutionally proscribe and would be constitutional if the reach of the statute were not overbroad.[6] We concluded that the legislative, effect-oriented "motive [was] obvious from the overall framework" of the law, even though it was not expressly referenced in the ordinance. *Maynard*, 168 Or App at 124. Here, the ordinance's provisions regarding illumination, visibility and the additional requirement of a continuous railing of at least three feet in height separating the performance area and the patron seating area, *in addition to* the four-foot spatial separation, make the ordinance's focus obvious. Understood in context, the regulatory provisions of the ordinance directly address the harms identified in the prefatory provisions of the ordinance.

One of the dissenting opinions contends that the above analysis cannot be reconciled with the principle of *Tidyman* that lawmakers must specify the harm in the regulation and may ban the expression only when it causes harm or is likely to do so. 184 Or App at 656-57 (Schuman, J., dissenting). Judge Schuman concludes that the defect that existed in *Tidyman* also exists in Ordinance 578. He asserts that "[w]e cannot say that *every* act of nude dancing within four feet of a patron necessarily involves sexual contact or even that it creates a high likelihood of sexual contact." 184 Or App at 657-58 (Schuman, J., dissenting) (emphasis added).[7] I have previously expressed why I believe the holding of *Tidyman* to be inapplicable and, even if it is applicable,

---

[6] From the text and the context of the statute, we discerned that the legislature's purpose in enacting ORS 167.065(1)(a) was "to protect children from the effects of hardcore pornography." *Maynard*, 168 Or App at 127.

[7] Judge Schuman would distinguish the holding in *Stoneman* from this case because child abuse arising from pornography depicting real sexual acts "was a *necessary fact*" in that case. 184 Or App at 657 (Schuman, J., dissenting). The fact that the particular ordinance at issue in this case differs in language and content from the statute the court considered in *Stoneman* does not affect the applicability of the broad rule set forth in that case. When determining whether a law restricts expression, we must look at the text and context of the law to determine whether it

why Ordinance 578 satisfies its requirements. I add only that Judge Schuman's apparent understanding of the *Tidyman* principle as applied to this case would mean that, before an ordinance could pass constitutional muster, the local government would have to find with certainty that the harm would occur in every instance in which it was sought to be prohibited. Such a rule presents an impossible burden for a local government to meet, a result that the framers of Article I, section 8, could not have intended regarding *all* sexually oriented expression. *See Ciancanelli*, 181 Or App at 9-15. Moreover, it is inconsistent with the Supreme Court's exposition of *Tidyman* in *League of Oregon Cities* which suggests that it is possible for a governmental entity to craft a regulation dealing with sexually oriented expression so long as it specifies the harms sought to be prohibited.

When a law is characterized as focusing on forbidden effects, but expressly prohibits expression used to achieve those effects, the next step of the constitutional analysis is whether the scope of its regulation regulates only the proscribed *harm* and not protected expression. As the court noted in *Stoneman*,

> "[S]tatutes that are by their terms aimed only at 'effects'— also are subject to challenge under Article I, section 8, on vagueness grounds or on the ground that the statute's reach, as applied to defendant, extends to privileged expression."

323 Or at 543. However, defendants make no facial vagueness or overbreadth challenges in this case.[8] Instead, they argued to the trial court by way of demurrer that, even if the ordinance were determined to be an effects-oriented statute, and therefore not facially unconstitutional, they were entitled to challenge the city's enactment process and the validity of the ordinance's "findings." Defendants told the trial court

is directed to the subject of any opinion or communication and, if so, whether it focuses on the content or, alternatively, the effect of such expression.

[8] At one point in their brief, defendants assert that, "[i]f this court does not believe that this ordinance is directed to the content of expression, then we must look to the second *Robertson* category, consisting of laws that focus on forbidden effects, but expressly prohibit expression used to achieve those effects." Although the sentence appears to point to an overbreadth argument, the argument that follows undercuts that notion.

that they wanted to put on evidence in support of their demurrer, to show that (1) defendant's other nude dancing club had not caused any of the undesired effects about which the city purported to be concerned, and (2) the city had not held a hearing to establish the necessity of the regulation. The trial court resolved that argument by ruling that it was procedurally improper to consider any proffered evidence because their challenge was made by demurrer.

On appeal, defendants also assert that, "[i]f the Nyssa four foot ordinance falls into 'type two' of the *Robertson* analysis, the trial court erred in denying the defendants the opportunity to present evidence."[9] That argument is resolved by ORS 135.630.[10] A demurrer can be raised for a number of reasons, but all of the reasons require a showing that, *on its face*, the accusatory instrument is inadequate. For instance, when a challenge is made to the constitutionality of the underlying statute on which the defendant is being charged, it is a challenge under ORS 135.630(4) that such a statute is incapable of providing the basis for a conviction. *See, e.g., State v. McKenzie*, 307 Or 554, 560, 771 P2d 264 (1989) ("If a statute is constitutionally too vague, then the facts alleged in an indictment under such a statute do not and cannot constitute an offense."). Such a challenge is resolved on the face of the demurrer. *State v. Horn*, 57 Or App 124, 128, 643 P2d 1338 (1982) ("In order to prevail on a demurrer on constitutional grounds, defendants must show that the statute under which they were charged is overbroad (or vague) *on its face*.") (emphasis added). The resolution of a demurrer requires a ruling as a matter of law, that the statute being challenged either is, or is not, constitutional. *See State v. Weber*, 172 Or

---

[9] The remainder of defendant's argument is that the city must hold an adjudicative hearing in order to determine whether the particular businesses being regulated will actually result in the type of harm being regulated. Therefore, according to defendant, the city had the burden in this case of showing that it made sufficient adjudicative findings, and the city did not present evidence of a hearing at which the findings were made.

[10] ORS 135.630 provides, in part:

"*The defendant may demur to the accusatory instrument when it appears upon the face thereof*:

"* * * * *

"(4) That the facts stated do not constitute an offense[.]"
(Emphasis added.)

App 704, 714, 19 P3d 378 (2001) ("Because the citation was *facially* sufficient, the court properly denied the demurrer." (footnote omitted; emphasis added)). Thus, the trial court did not err in denying defendant's request to put on evidence in this case.

In sum, the majority errs when it analyzes the city's ordinance as if it is directed at the content of communication and then considers whether the subject of the ordinance falls within a historical exception. Rather, the ordinance does not implicate Article I, section 8, because it is not directed at the substance of any opinion or the subject of any communication. Even assuming that the law restricts expression, it is clearly directed at preventing sexual contact between performers and patrons and therefore must be analyzed as a law that focuses on the effect rather than the content of expression. In light of those conclusions and the fact that there is no claim that the reach of the ordinance is overbroad, defendant's challenge under Article I, section 8, necessarily fails. For the above reasons, I concur in the majority's result, but not its reasoning.

**ARMSTRONG, J.,** dissenting.

The majority concludes that a restriction imposed by the City of Nyssa that requires nude entertainers and their audience to maintain a four-foot distance between each other comes within a historical exception to the protection afforded free expression by Article I, section 8, of the Oregon Constitution. The majority reasons that our decision in *State v. Ciancanelli*, 181 Or App 1, 45 P3d 451, *rev allowed*, 335 Or 90 (2002), establishes that state prohibitions against sexual conduct and nudity in live expressive performances come within a historical exception to Article I, section 8, so lesser restrictions on that conduct are permitted as well. I respectfully dissent.

I will not repeat the arguments that I made in my dissent in *Ciancanelli*. All of them apply to the majority's decision in this case. *See Ciancanelli*, 181 Or App at 47-54 (Armstrong, J., dissenting).

I will add one comment, however, about the distinction between laws that regulate conduct and those that regulate expression. The principal point of Article I, section 8, and its modern analysis is to identify for the legislature the laws restricting expression that it cannot enact. Laws directed at conduct may run afoul of Article I, section 8, when they are used to restrict expression, but the provision generally does not address *the continued validity or enactment* of those laws.[1] Because the provision is indifferent to the existence or enactment of laws directed at conduct rather than expression, laws directed at conduct are *not* the subject of the historical exception component of the modern analysis. That component of the analysis recognizes that Article I, section 8, was meant to displace some but not all laws that restricted *expression*. It does that by identifying the laws restricting expression that survived the adoption of the guarantee. Because Article I, section 8, was not intended to displace any law that restricted *conduct*, laws restricting conduct are not the subject of the exception. Consequently, contrary to the majority's view, the issue here and in *Ciancanelli* is *not* whether there were well-established laws in 1859 that restricted public nudity and most forms of sexual conduct. There were such laws, and Article I, section 8, did not affect them.

The existence of those laws does not bear, however, on the determinative issue here, which is whether there were well-established laws in 1859 that specifically restricted sexual conduct and nudity in dance, theatrical, and similar performances presented to willing adult audiences. Neither the state nor the majority has shown that laws of that kind were well established in 1859. Furthermore, precisely because the guarantee in Article I, section 8, is a guarantee of free expression, the state must demonstrate that laws that expressly restricted the expressive use of sexual conduct and nudity in live performances were intended to survive the adoption of the guarantee even if laws restricting sexual conduct and

---

[1] *Cf. State v. Robertson*, 293 Or 402, 417 n 11, 649 P2d 569 (1982) (notes that law directed at conduct conceivably could be challenged as violating Article I, section 8, if it could be established "that suppression of expression itself was the intended or expected object of the law").

nudity in all other expressive media did *not* survive the adoption of the guarantee, *see State v. Henry*, 302 Or 510, 524-25, 732 P2d 9 (1987), and even if the conduct that was the subject of those restrictions were otherwise lawful. In other words, the state must establish that the people intended to preserve their ability to restrict the expressive use of sexual conduct and nudity in dance, theater, and similar media even if they no longer chose to restrict that conduct independently of its expressive use. Neither the state nor the majority has made that showing.

I will also respond to an argument that the city makes that the majority does not address. The city argues that the restriction that requires nude performers and their audience to remain four feet apart from each other does not restrict expression, because it does not interfere with the ability of the performers to communicate and the audience to perceive the information that the performers present. The city is wrong.

The city ordinance unquestionably imposes a restriction on expression based on the content of the affected expression. It requires dancers, actors, performance artists, choreographers, and directors who use nudity in their expressive work to maintain a four-foot distance between nude performers and their audience while permitting all other performers to get as close to their audience as they choose. A restriction on the manner in which expression can occur based on the content of the expression is a restriction on expression. It does not become something other than a restriction on expression simply because some expression can occur notwithstanding the restriction.[2] If the city were right, then so-called time, place, and manner restrictions on expression would not be considered to be restrictions at all, because

---

[2] It should be obvious that the effect and effectiveness of communication is affected by the manner in which it occurs. Proximity to a live performance makes a difference to the effect of the performance on an audience. If it did not, then people would not pay more to sit closer to a performance. Both performers and their audience may be mistaken about the importance of proximity to the effect of a particular communication, but a content-based restriction on the distance between performers and their audience cannot be defended on the ground that it is not a restriction on expression.

they, too, allow expression to occur notwithstanding their imposition.

At bottom, it is the prerogative of those involved in expression to determine how they wish to communicate. Their ability to challenge a particular restriction on expression does not depend on their ability to present evidence that persuades a court that the restriction affects their ability to communicate a particular thought or emotion or the ability of their audience to have a particular reaction or experience. A restriction that targets expression, as the city's ordinance does, is a restriction that is subject to scrutiny for compliance with the prohibition in Article I, section 8, against the imposition of governmental restrictions on expression.

As to the merits, it is worth emphasizing the effect of the majority's decision. If the majority is correct, then Article I, section 8, permits the state to prohibit all nudity in all live performances. That means, of course, that plays such as *Hair* and *Oh! Calcutta!* and the current Broadway production of *The Graduate* would be subject to prohibition under the Oregon Constitution. In that light, the majority's decision in this case places the majority's decision in *Ciancanelli* in stark relief. As things now stand in Oregon, the Oregon Constitution provides broad protection against state restrictions on the use of nudity in film, print, and similar media but no protection against restrictions on the use of nudity in live expressive work. That makes no sense. Unfortunately, the untenable dichotomy that the majority has created between live expression and all other expression involving the use of nudity must await correction by the Supreme Court.[3]

---

[3] The majority notes that the First Amendment also protects expression against restriction, so some nudity will be permitted in live performances in Oregon notwithstanding the majority's decisions in this case and in *Ciancanelli*. That is true, of course. It should be noted, however, that the state can effectively prohibit nude dancing of the type at issue in this case without violating the First Amendment. *See Barnes v. Glen Theatre, Inc.*, 501 US 560, 111 S Ct 2456, 115 L Ed 2d 504 (1991).

The majority is also right to note that the policy choices that the people and the state make need not make sense unless the law requires them to do so. However, that should not obscure the fact that the current untenable dichotomy in the treatment afforded nudity and sexually explicit expression under the Oregon Constitution is not the product of historical differences in the treatment of them. Rather, it is the product of the majority's implicit decision to challenge the Supreme Court's decision in *Henry*, 302 Or at 520-25. I explained at length in my dissent in

**SCHUMAN, J.,** dissenting.

Neither the majority opinion nor the concurrence persuades me that a law requiring nude "adult" entertainers to remain four feet away from their audience survives scrutiny under Article I, section 8, of the Oregon Constitution as construed by binding Oregon Supreme Court precedent. I understand that the majority finds support in an opinion of this court.[1] For that reason, this dissent is not only swimming upstream, but swimming upstream through water that is over the dam. The arguments have been made here before; I will therefore be brief.

The majority holds that this case is controlled by *State v. Ciancanelli*, 181 Or App 1, 45 P3d 451, *rev allowed*, 335 Or 90 (2002). 184 Or App at 634-35. That may or may not be accurate.[2] Assuming that it is, I dissent because I believe that *Ciancanelli* was wrongly decided. I did not participate in that case, and I neither want nor intend to reopen the thorough debate between its majority and dissents. Suffice it to say that, in my opinion, the *Ciancanelli* majority's historical research does not demonstrate that, at the time the Oregon Constitution was written and adopted, a widely known and well-established statute or common-law principle prohibited people from putting on, participating in, or observing shows including nudity, when the nudity was not exposed to view by the general, unwilling public. The research *does* demonstrate that exposing the genitals to the general, unwilling public was widely banned. And from the research we can probably infer that, had the framers been asked whether lawmakers

---

*Ciancanelli* how the historical record on which the majority relied in *Ciancanelli* to uphold restrictions on sexually explicit expression and nudity in live performances is the same historical record that the court in *Henry* and that we in *State v. Maynard*, 168 Or App 118, 5 P3d 1142 (2000), *rev den*, 332 Or 137 (2001), rejected as insufficient to uphold restrictions on sexually explicit expression in film, print, and other media. *See Ciancanelli*, 181 Or App at 48-51 (Armstrong, J., dissenting). Hence, the problem lies with us, not with the historical record.

[1] *State v. Ciancanelli*, 181 Or App 1, 45 P3d 451, *rev allowed*, 335 Or 90 (2002).

[2] *Ciancanelli* sustained a statute prohibiting live sex shows. This case involves only nude dancing. The *Ciancanelli* majority opinion did, however, flow necessarily from the predicate conclusion that "public exposure of the genitals" was widely regulated at the time the Oregon Constitution was adopted and therefore could be regulated now. 181 Or App at 16. It is therefore at least arguable that the conclusion regarding nudity was a necessary part of the conclusion regarding live sex shows and for that reason part of the holding.

could ban limited-admission sex shows, they would unhesitatingly have said that they could. They might well have said such shows were already unlawful. But the crucial fact is, nothing in the majority's historical research shows that such a ban did exist and that it was well established and widely known. That is what *State v. Robertson*, 293 Or 402, 649 P2d 569 (1982), and subsequent Supreme Court cases require. Further, even if historical research could uncover a well-settled law banning limited-admission nude shows, that is not the kind of historical exception that *Robertson* envisions: that case uses the carefully chosen phrases "conventional crime," *id.* at 433, and "historical exception that was well established," *id.* at 412. It provides examples: "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants." *Id.* at 412. Laws regulating nude dancing or sex shows, whether we approve of them or not, are not the kind of well-established conventional speech crimes that the *Robertson* court envisioned.

The concurrence takes a different approach, arguing that the Nyssa ordinance is not addressed to expression *per se* but to the harmful effects of nude dancing within four feet of patrons, namely, "sexual contact between performers and customers." 184 Or App at 644 (Edmonds, J., concurring). For that reason, the concurrence reasons, the ordinance survives, because laws aimed at harm caused by speech are permissible unless overbroad. *Id.* at 649 (Edmonds, J., concurring). That analysis cannot be reconciled with *City of Portland v. Tidyman*, 306 Or 174, 759 P2d 242 (1988). The bedrock principle of *Tidyman* is that lawmakers cannot ban particular expressions based on the presumption that the expressions cause harm (so-called "secondary effects," *Renton v. Playtime Theaters, Inc.*, 475 US 41, 47, 106 S Ct 925, 89 L Ed 2d 29 (1986)), even if those presumptions are stated in legislative findings and the harm is of the type ordinarily subject to regulation.[3] Instead, lawmakers must specify the harm and may ban the expression only

---

[3] Of course, one kind of harm that is *not* subject to regulation is the "harm" of " 'causing another person to see' or 'to hear' whatever the lawmakers wish to suppress." A law addressed at that "harm" is transparently a law addressed at expression *per se*. *State v. Moyle*, 299 Or 691, 699, 705 P2d 740 (1985).

when it causes that harm or is imminently likely to do so. *Tidyman*, 306 Or at 185-86. That rule is not mere linguistic game-playing; it prevents lawmakers who might find certain expression to be offensive from banning it pretextually on the excuse that it is "harmful." By requiring specification of the harm itself and banning the expression only when the harm occurs or is imminent, the *Tidyman* rule permits lawmakers to regulate the harm they purport to be regulating when they employ a "secondary effects" analysis while prohibiting them from using such an analysis as a smoke screen to ban expression that, for one reason or another, they do not like.

Ordinarily, a statute that bans speech when the speech causes a regulable effect must specify what that effect is and operate only when the effect is accomplished or imminently likely. *State v. Stoneman*, 323 Or 536, 920 P2d 535 (1996), creates a very narrow exception. In that case, the Supreme Court upheld a statute imposing criminal sanctions for observing or obtaining child pornography in the form of a " 'photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child under 18 years of age.' " *Id.* at 539 (quoting ORS 163.680). The court upheld the statute because it indirectly criminalized "material, the production of which *necessarily* involves harm to children." *Id.* at 546 (emphasis in original; footnote omitted). The court carefully noted that the law, in context, did not ban material that *"is not the product of an act of actual sexual abuse of a child." Id.* at 547 (emphasis in original). The statute at issue in *Stoneman* survived only because the link between the prohibited expression—child pornography depicting real sexual acts involving real children—was not a legislative presumption or a statistical probability or an intuitively apparent connection. It was a *necessary fact*:

> "We conclude that ORS 163.680 (1987) prohibited the purchase of certain communicative materials, not in terms of their communicative *substance*, but in terms of their status as the products of acts that necessarily have harmed the child participants. So understood, it will be seen that the statute punished sexual exploitation by *commerce* that is a continuation and an integral part of the underlying harmful acts."

*Stoneman*, 323 Or at 548 (emphasis in original). Every act of producing or obtaining the regulated expressive material contributed to or facilitated actual regulable harm: child abuse.

Under those precepts, the Nyssa ordinance cannot survive as a regulation of harm. We cannot say that every act of nude dancing within four feet of a patron necessarily involves sexual contact or even that it creates a high likelihood of sexual contact. If the Nyssa lawmakers want to regulate sexual contact or attempts to achieve sexual contact, they are free to do so, even if in so doing they incidentally stifle the occasional nude dancer. What they cannot do is regulate sexual expression (by, for example, mandating where it may or may not occur) because they believe, or "find," that doing so might help regulate sexual contact.

For the foregoing reasons, I dissent.

Armstrong and Brewer, JJ., join in this dissent.